IN THE CIRCUIT COURT FOR Baltimore City

(City or County)

## CIVIL - NON-DOMESTIC CASE INFORMATION REPORT

### DIRECTIONS

*Plaintiff*: This Information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Judge of the Court of Appeals pursuant to Rule 2-111(a).

*Defendant*: You must file an Information Report as required by Rule 2-323(h).

*THIS INFORMATION REPORT CANNOT BE ACCEPTED AS A PLEADING*

**FORM FILED BY:** ☒PLAINTIFF ☐DEFENDANT   **CASE NUMBER** _____

(Clerk to insert)

**CASE NAME:** Alpheaus Bangura, et al. vs. Maryland Department of Public Sa, et al.

Plaintiff | Defendant

**PARTY'S NAME:** Alpheaus Bangura   **PHONE:** 301-587-9373

**PARTY'S ADDRESS:** 8757 Georgia Ave, Suite 400 Silver Spring, MD 20910

**PARTY'S E-MAIL:** _____

**If represented by an attorney:**

**PARTY'S ATTORNEY'S NAME:** Edith K. Thomas   **PHONE:** 301-587-9373

**PARTY'S ATTORNEY'S ADDRESS:** 8757 Georgia Avenue, Suite 400, Silver Spring, MD 20910

**PARTY'S ATTORNEY'S E-MAIL:** ethomas@zagfirm.com

**JURY DEMAND?** ☒Yes ☐No

**RELATED CASE PENDING?** ☐Yes ☒No  If yes, Case #(s), if known:_____

**ANTICIPATED LENGTH OF TRIAL?:** _____ hours   4 days

### PLEADING TYPE

**New Case:** ☒Original   ☐Administrative Appeal   ☐Appeal

**Existing Case:** ☐Post-Judgment   ☐Amendment

*If filing in an existing case*, skip Case Category/ Subcategory section - go to Relief section.

### IF NEW CASE: CASE CATEGORY/SUBCATEGORY (Check one box.)

**TORTS**
- ☐ Asbestos
- ☐ Assault and Battery
- ☐ Business and Commercial
- ☐ Conspiracy
- ☐ Conversion
- ☐ Defamation
- ☐ False Arrest/Imprisonment
- ☐ Fraud
- ☐ Lead Paint - DOB of Youngest Plt: _____
- ☐ Loss of Consortium
- ☐ Malicious Prosecution
- ☐ Malpractice-Medical
- ☐ Malpractice-Professional
- ☐ Misrepresentation
- ☐ Motor Tort
- ☐ Negligence
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability
- ☐ Specific Performance
- ☐ Toxic Tort
- ☐ Trespass
- ☐ Wrongful Death

**CONTRACT**
- ☐ Asbestos
- ☐ Breach
- ☐ Business and Commercial
- ☐ Confessed Judgment (Cont'd)
- ☐ Construction
- ☐ Debt
- ☐ Fraud

- ☐ Government
- ☐ Insurance
- ☐ Product Liability

**PROPERTY**
- ☐ Adverse Possession
- ☐ Breach of Lease
- ☐ Detinue
- ☐ Distress/Distrain
- ☐ Ejectment
- ☐ Forcible Entry/Detainer
- ☐ Foreclosure
  - ☐ Commercial
  - ☐ Residential
  - ☐ Currency or Vehicle
  - ☐ Deed of Trust
  - ☐ Land Installments
  - ☐ Lien
  - ☐ Mortgage
  - ☐ Right of Redemption
  - ☐ Statement Condo
- ☐ Forfeiture of Property / Personal Item
- ☐ Fraudulent Conveyance
- ☐ Landlord-Tenant
- ☐ Lis Pendens
- ☐ Mechanic's Lien
- ☐ Ownership
- ☐ Partition/Sale in Lieu
- ☐ Quiet Title
- ☐ Rent Escrow
- ☐ Return of Seized Property
- ☐ Right of Redemption
- ☐ Tenant Holding Over

**PUBLIC LAW**
- ☐ Attorney Grievance
- ☐ Bond Forfeiture Remission
- ☐ Civil Rights
- ☐ County/Mncpl Code/Ord
- ☐ Election Law
- ☐ Eminent Domain/Condemn.
- ☐ Environment
- ☐ Error Coram Nobis
- ☐ Habeas Corpus
- ☐ Mandamus
- ☐ Prisoner Rights
- ☐ Public Info. Act Records
- ☐ Quarantine/Isolation
- ☐ Writ of Certiorari

**EMPLOYMENT**
- ☐ ADA
- ☐ Conspiracy
- ☐ EEO/HR
- ☒ FLSA
- ☐ FMLA
- ☐ Workers' Compensation
- ☐ Wrongful Termination

**INDEPENDENT PROCEEDINGS**
- ☐ Assumption of Jurisdiction
- ☐ Authorized Sale
- ☐ Attorney Appointment
- ☐ Body Attachment Issuance
- ☐ Commission Issuance

- ☐ Constructive Trust
- ☐ Contempt
- ☐ Deposition Notice
- ☐ Dist Ct Mtn Appeal
- ☐ Financial
- ☐ Grand Jury/Petit Jury
- ☐ Miscellaneous
- ☐ Perpetuate Testimony/Evidence
- ☐ Prod. of Documents Req.
- ☐ Receivership
- ☐ Sentence Transfer
- ☐ Set Aside Deed
- ☐ Special Adm. - Atty
- ☐ Subpoena Issue/Quash
- ☐ Trust Established
- ☐ Trustee Substitution/Removal
- ☐ Witness Appearance-Compel

**PEACE ORDER**
- ☐ Peace Order

**EQUITY**
- ☐ Declaratory Judgment
- ☐ Equitable Relief
- ☐ Injunctive Relief
- ☐ Mandamus

**OTHER**
- ☐ Accounting
- ☐ Friendly Suit
- ☐ Grantor in Possession
- ☐ Maryland Insurance Administration
- ☐ Miscellaneous
- ☐ Specific Transaction
- ☐ Structured Settlements

Exhibit 1

## IF NEW OR EXISTING CASE: RELIEF (Check All that Apply)

☐ Abatement
☐ Administrative Action
☐ Appointment of Receiver
☐ Arbitration
☐ Asset Determination
☐ Attachment b/f Judgment
☐ Cease & Desist Order
☐ Condemn Bldg
☐ Contempt
☐ Court Costs/Fees
☐ Damages-Compensatory
☐ Damages-Punitive

☐ Earnings Withholding
☐ Enrollment
☐ Expungement
☐ Findings of Fact
☐ Foreclosure
☐ Injunction
☐ Judgment-Affidavit
☐ Judgment-Attorney Fees
☐ Judgment-Confessed
☐ Judgment-Consent
☐ Judgment-Declaratory
☐ Judgment-Default

☐ Judgment-Interest
☐ Judgment-Summary
☐ Liability
☐ Oral Examination
☐ Order
☐ Ownership of Property
☐ Partition of Property
☐ Peace Order
☐ Possession
☐ Production of Records
☐ Quarantine/Isolation Order
☐ Reinstatement of Employment

☐ Return of Property
☐ Sale of Property
☐ Specific Performance
☐ Writ-Error Coram Nobis
☐ Writ-Execution
☐ Writ-Garnish Property
☐ Writ-Garnish Wages
☐ Writ-Habeas Corpus
☐ Writ-Mandamus
☐ Writ-Possession

*If you indicated **Liability** above*, mark one of the following. This information is **not** an admission and may not be used for any purpose other than Track Assignment.

☐ Liability is conceded.   ☐ Liability is not conceded, but is not seriously in dispute.   ☐ Liability is seriously in dispute.

## MONETARY DAMAGES (Do not include Attorney's Fees, Interest, or Court Costs)

☐ Under $10,000     ☐ $10,000 - $30,000     ☐ $30,000 - $100,000     ☐ Over $100,000

☐ Medical Bills $_____     ☐ Wage Loss $____TBD____     ☐ Property Damages $_____

## ALTERNATIVE DISPUTE RESOLUTION INFORMATION

Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)

A. Mediation     ☒Yes   ☐No          C. Settlement Conference   ☒Yes   ☐No
B. Arbitration   ☐Yes   ☒No          D. Neutral Evaluation      ☐Yes   ☒No

## SPECIAL REQUIREMENTS

☒ If a Spoken Language Interpreter is needed, **check here and attach form CC-DC-041**

☐ If you require an accommodation for a disability under the Americans with Disabilities Act, **check here and attach form CC-DC-049**

## ESTIMATED LENGTH OF TRIAL

*With the exception of Baltimore County and Baltimore City, please fill in the estimated **LENGTH OF TRIAL**.*   **(Case will be tracked accordingly)**

☐ 1/2 day of trial or less          ☒ 3 days of trial time

☐ 1 day of trial time               ☐ More than 3 days of trial time

☐ 2 days of trial time

## BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM

*For all jurisdictions, if Business and Technology track designation under Md. Rule 16-308 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ **Expedited**- Trial within 7 months of          ☐ **Standard** - Trial within 18 months of
   Defendant's response                               Defendant's response

EMERGENCY RELIEF REQUESTED

## COMPLEX SCIENCE AND/OR TECHNOLOGICAL CASE MANAGEMENT PROGRAM (ASTAR)

*FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO ASTAR RESOURCES JUDGES under Md. Rule 16-302, attach a duplicate copy of complaint and check whether assignment to an ASTAR is requested.*

☐ **Expedited -** Trial within 7 months of Defendant's response          ☐ **Standard -** Trial within 18 months of Defendant's response

*IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY, OR BALTIMORE COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.*

### CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

| | | |
|---|---|---|
| ☐ | Expedited | Trial 60 to 120 days from notice. Non-jury matters. |
| ☐ | Civil-Short | Trial 210 days from first answer. |
| ☐ | Civil-Standard | Trial 360 days from first answer. |
| ☐ | Custom | Scheduling order entered by individual judge. |
| ☐ | Asbestos | Special scheduling order. |
| ☐ | Lead Paint | Fill in: Birth Date of youngest plaintiff_____. |
| ☐ | Tax Sale Foreclosures | Special scheduling order. |
| ☐ | Mortgage Foreclosures | No scheduling order. |

### CIRCUIT COURT FOR BALTIMORE COUNTY

| | | |
|---|---|---|
| ☐ | Expedited (Trial Date-90 days) | Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus. |
| ☐ | Standard (Trial Date-240 days) | Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases. |
| ☐ | Extended Standard (Trial Date-345 days) | Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency. |
| ☐ | Complex (Trial Date-450 days) | Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases. |

7/21/2023
_____
Date

8757 Georgia Avenue, Suite 400
_____
Address

Silver Spring          MD          20910
_____     _____     _____
City                State      Zip Code

_____
Signature of Counsel / Party

Edith K. Thomas, Esq. (CPF# 0412150354)
_____
Printed Name

# Contents

I.    CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND .................................................3

III.    NATURE OF ACTION...........................................................................................................4

IV.    PARTIES..............................................................................................................................5

V.    JURISDICTION & VENUE..................................................................................................6

VI.    FACTS COMMON TO ALL COUNTS................................................................................6

A.    The Maryland Correctional Training Center .................................................................6

B.    The Position of Correctional Officer...........................................................................8

C.    40 West ..........................................................................................................................9

D.    Policies And Laws........................................................................................................13

E.    Discipline .....................................................................................................................14

F.    Pay And Promotions ....................................................................................................16

i.    Weapons Training ...................................................................................................19

ii.    Overtime Opportunities .......................................................................................20

iii.    Posts .....................................................................................................................22

G.    Retaliation ...................................................................................................................22

H.    Harassment And Hostile Work Environment ............................................................24

V. INDIVIDUAL PLAINTIFFS' FACTS .....................................................................................28

A.    Plaintiff Grant .............................................................................................................28

B.    Plaintiff Britto..............................................................................................................30

C.    Plaintiff Bangura .........................................................................................................33

D.    Plaintiff Guy................................................................................................................35

E.    Plaintiff Lovelace.........................................................................................................37

VII.    CIVIL RIGHTS CLASS ACTION ALLEGATIONS .......................................................39

184.    Proposed Sub-Classes of the Civil Rights Class: .................................................40

VIII.    RACKETEERING INFLUENCED .................................................................................42

CORRUPT ORGANIZATION CLASS ACTION ALLEGATIONS ..........................................42

COUNT I:...................................................................................................................................45

Discrimination and Retaliation ..................................................................................................45

in Violation of the 1866 Civil Rights Act, .................................................................................45

42 U.S.C. § 1983 ("Section 1983") on behalf of all Plaintiffs and CRC Plaintiffs ..................45

(Defendant DPSCS)....................................................................................................................45

COUNT II:.................................................................................................................................49

Discrimination and Retaliation ..................................................................................................49

in Violation of the 1866 Civil Rights Act,.................................................................................49

42 U.S.C. § 1983 ("Section 1983") on behalf of all Plaintiffs and CRC Plaintiffs ..............................49

(40 West Defendants) ...........................................................................................................49

COUNT III: ...........................................................................................................................53

Discrimination and Retaliation ...........................................................................................53

in Violation of Title VII of the Civil Rights Act of 1964, ..................................................53

as amended, 42 U.S.C. § 2000e et seq., on behalf of Plaintiffs and the CRC Plaintiffs ......................53

(Defendant DPSCS) ..............................................................................................................53

COUNT IV: ............................................................................................................................55

Discrimination and Retaliation ...........................................................................................55

in Violation of MFEPA, Md. Code Ann., ...........................................................................55

State Gov't § 20-601 *et seq.*, on behalf of Plaintiffs and CRC Plaintiffs ..........................55

(Defendant DPSCS) ..............................................................................................................55

COUNT V: ..............................................................................................................................64

Conspiracy to Interfere with Civil Rights ..........................................................................64

in Violation of 42 U.S.C. § 1985(3), on behalf of Plaintiffs and CRC Plaintiffs ..................64

(40 West Defendants) ...........................................................................................................64

## IN THE CIRCUIT COURT FOR
## BALTIMORE CITY, MARYLAND

ALPHEAUS BANGURA                                        )
8757 Georgia Ave, Suite 400                             )
Silver Spring, MD 20910                                 )
                                                        )
and                                                     )
                                                        )
AKINLOLU BRITTO                                         )
8757 Georgia Ave, Suite 400                             )
Silver Spring, MD 20910                                 )
                                                        )
and                                                     )
                                                        )
COLENZO GRANT                                           )
8757 Georgia Ave, Suite 400                             )
Silver Spring, MD 20910                                 )
                                                        )
and                                                     )
                                                        )
MARANDA GUY                                             )
8757 Georgia Ave, Suite 400                             )
Silver Spring, MD 20910                                 )
                                                        )
and                                                     )
                                                        )
MACARDY LOVELACE                                        )
8757 Georgia Ave, Suite 400                             )
Silver Spring, MD 20910                                 )
                                                        )
ON BEHALF OF THEMSELVES                                 )
AND ALL OTHERS SIMILARLY SITUATED                       )
                                                        )
                    Plaintiffs,                         )
                                                        )
v.                                                      )
                                                        )
DEPARTMENT OF PUBLIC SAFETY                             )
AND CORRECTIONAL SERVICES                               )
6776 Reisterstown Road, Suite 204                       )
Baltimore, MD 21215                                     )
                                                        )
**Serve:** Carolyn Scruggs                              )
        Secretary of Public Safety &                    )
        Correctional Services                           )

6776 Reisterstown Road, Suite 204 )
Baltimore, MD 21215 )
)
and )
)
WARDEN WILLIAM BOHRER )
In His Official and Individual Capacity )
18800 Roxbury Road )
Hagerstown, Maryland 21746 )
)
and )
)
SECURITY CHIEF JOSEPH LOHMAN )
In His Official and Individual Capacity )
18800 Roxbury Road )
Hagerstown, Maryland 21746 )
)
and )
)
GARY DURBORAW )
In His Official and Individual Capacity )
18800 Roxbury Road )
Hagerstown, Maryland 21746 )
)
and )
)
JOSEPH GARLITZ )
In His Official and Individual Capacity )
18800 Roxbury Road )
Hagerstown, Maryland 21746 )
)
and )
)
JOHN DOES 1-25 )
(UNKNOWN 40 WEST CO-CONSPIRATORS) )
)
Defendants. )
)

2

## I.    CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND

Plaintiffs Colenzo Grant, Akinlolu Britto, Alpheaus Bangura, Maranda T. Guy, and Macardy Lovelace (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through undersigned counsel, bring this Individual and Class Action lawsuit against the Maryland Department of Public Safety and Correctional Services ("DPSCS" or "Defendant DPSCS"). Plaintiffs also bring Individual and Class claims against Warden William Bohrer ("Mr. Bohrer" or "Defendant Bohrer"), Security Chief Joseph Lohman ("Mr. Lohman" or "Defendant Lohman"), Gary Durboraw ("Mr. Durboraw" or "Defendant Durboraw"), Joseph Garlitz ("Mr. Garlitz" and "Defendant Garlitz"), and John Does 1-25 (Unknown 40 West Co-Conspirators) (collectively, "40 West Defendants") in their Official and Individual capacities. Plaintiffs are seeking to recover from all Defendants for violations of 42 U.S.C. §§ 1981, 1983, 1985, and 42 U.S.C. § 2000e-2 ("Title VII"); Md. State Government Code Ann., § 20-1001, *et seq.* ("MFEPA"); and 18 U.S.C. 1961, *et seq.* ("RICO").

## II.    PRELIMINARY STATEMENT

Before the court is a case about shocking racial discrimination and egregious harassment of correctional officers based on their race and ethnic backgrounds. The Maryland Correctional Training Center, located in Hagerstown, Maryland, is a toxic environment where racial slurs and discrimination against persons of color, especially black officers and African immigrants, occurs not only with impunity, but is encouraged and coordinated by a gang of white officers.

The racial taunts are not merely occasional but insidious, serving as a relentless soundtrack to their workday. Disparaging epithets such as the "N----," "wigger," and "trash pandas"—the latter an offensive contemporary twist on the historically derisive term "coon"—are used to refer to black officers. White officers are not afraid to display symbols of hate, including on their bodies, and at least one officer has a tattoo of a swastika. There are brazen taunts when white officers

mimic monkey noises, over the intercom and directly at their black colleagues. This conduct is not covert or hushed; it is flamboyantly displayed and bragged about, consequence-free, spanning all ranks within the institution.

A conspiracy to commit discrimination, retaliation, and fraud has been coordinated and encouraged by a gang of white officers and has impacted black officers by creating a hostile work environment, damaging black officers' ability to earn extra pay and promotions. Defendant DPSCS has engaged in discriminatory practices and retaliation in violation of Section 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000 *et seq.* ("Title VII"), Title 20 of the Maryland Human Relations Act in Employment, the Fourteenth Amendment of the United States Constitution, and 42 U.S.C. §§ 1981, 1983, 1985. Plaintiffs bring their discrimination claims based on disparate impact discrimination because many policies and practices perpetuated by DPSCS had a disparate impact on minority officers. Plaintiffs bring their constitutional claims for both damages and injunctive relief against all Defendants. Plaintiffs also bring claims against the 40 West Defendants, individually, for violations of the Racketeering Influenced Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961, *et seq.* Plaintiffs seek equitable remedies, injunctive relief, damages, attorney and expert fees, and costs to redress Defendants' unlawful acts.

### III.   NATURE OF ACTION

1.   The Maryland Correctional Training Center ("MCTC"), located at 18800 Roxbury Road, Hagerstown, Maryland 21746, is a facility operated by DPSCS.

2.   MCTC houses medium, minimum, and pre-release prisoners for the State of Maryland.

3.   DPSCS has hired Correctional Officers ("COs") to guard the prisoners and operate the MCTC.

4

4.      Upon information and belief, prior to 2018, a gang was formed at MCTC known as "40 West" which includes the 40 West Defendants.

5.      This gang has operated at MCTC with the direct and/or indirect support of multiple Wardens at the facility and has engaged in a pattern and practice of discrimination, retaliation, creating a hostile work environment, and conspiracy to commit the same against Persons of Color ("POCs") and immigrants. Further, the gang has fraudulently acquired the overtime compensation shifts of countless individuals, including Plaintiffs, who worked at MCTC for an unknown period of time.

## IV.      PARTIES

6.      Alpheaus Bangura ("Mr. Bangura" or "Plaintiff Bangura") is a resident and domiciliary of the State of Maryland can be contacted through his attorneys at Zipin, Amster, & Greenberg, PLLC, 8757 Georgia Ave, Suite 400, Silver Spring, MD 20910.

7.      Akinlolu Britto ("Mr. Britto" or "Plaintiff Britto") is a resident and domiciliary of the State of West Virginia residing can be contacted through his attorneys at Zipin, Amster, & Greenberg, PLLC, 8757 Georgia Ave, Suite 400, Silver Spring, MD 20910.

8.      Colenzo Grant ("Mr. Grant" or "Plaintiff Grant") is a resident and domiciliary of the State of Maryland and can be contacted through his attorneys at Zipin, Amster, & Greenberg, PLLC, 8757 Georgia Ave, Suite 400, Silver Spring, MD 20910.

9.      Maranda T. Guy ("Ms. Guy" or "Plaintiff Guy") is a resident and domiciliary of the State of and can be contacted through her attorneys at Zipin, Amster, & Greenberg, PLLC, 8757 Georgia Ave, Suite 400, Silver Spring, MD 20910.

10.      Macardy Lovelace ("Ms. Lovelace" or "Plaintiff Lovelace") is a resident and domiciliary of the State of Maryland and can be contacted through her attorneys at Zipin, Amster, & Greenberg, PLLC, 8757 Georgia Ave, Suite 400, Silver Spring, MD 20910.

11. DPSCS is an agency of the State of Maryland with its principal place of business at 6776 Reisterstown Road, Baltimore, MD 21215.

12. The 40 West Defendants are all agents, servants, and/or employees of DPSCS and work at MCTC located at 18800 Roxbury Road, Hagerstown, Maryland 21746.

## V.   JURISDICTION & VENUE

13. Venue is proper under Section 2000e–5(f)(3), which provides that civil actions under Title VII may be brought in the judicial district in which the employment records relevant to such practice are maintained and administered.

14. Subject matter jurisdiction of this Court is invoked pursuant to Md. Code Ann., Cts. & Jud. Proc. § 1-501, *et seq.*

15. Personal jurisdiction of this Court is invoked pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-102 as the tortious actions herein described occurred within the State of Maryland.

16. Pursuant to Maryland 2-305, Plaintiffs are seeking damages in excess of $75,000.00.

17. Pursuant to Md. Rule 2-231, Plaintiffs bring claims alleging a class-wide violation.

18. Plaintiffs hereby demand a jury trial on the allegations below.

19. Plaintiff reserves the right to amend this Complaint should it be removed to the United States District Court for the District of Maryland to comply with any and all Local Rules and/or the Federal Rules of Civil Procedure.

## VI.   FACTS COMMON TO ALL COUNTS

### A. The Maryland Correctional Training Center

20. All of the Plaintiffs and similarly situated individuals are and/or were employed at MCTC.

21.     As an "Administrative One" facility, MCTC is the largest single-compound correctional institution in Maryland and was established in 1966. MCTC primarily accommodates male inmates aged 18 to 77 with medium, minimum, and pre-release security levels.

22.     MCTC does not house female inmates or youthful offenders. It serves as the Direct Intake Unit (reception center) for Garrett, Allegany, Washington, Frederick, Carroll, and Montgomery counties, and has the capacity to house maximum security inmates if necessary. MCTC reported admissions of 1,333 inmates with stays of 72 hours and 1,307 inmates with stays of 30 days or more. The average inmate designation at MCTC is 14 months.

23.     Designed as a compound-style facility, MCTC's inner perimeter comprises housing units, vocational buildings, an administration building, recreational areas, medical facilities, Receiving & ID, inmate kitchen and dining, staff dining, program areas, a chapel, inmate visiting areas, and other correctional setting structures. Within the secure perimeter, 21 buildings, including housing units, are located on approximately 37 acres. Additionally, 240 acres surround the exterior perimeter.

24.  The Housing Units ("HU") are designated as follows:

    a.  HU# 1: General population inmates, open housing, 4 tiers (A, B, C, D).
    b.  HU# 2: General population inmates, open housing, 4 tiers (A, B, C, D).
    c.  HU# 3: General population inmates, closed housing, 3 tiers (A, B, C).
    d.  HU# 4: General population inmates, closed housing, 3 tiers (A, B, C).
    e.  HU# 5: General population inmates, closed housing, 4 tiers (A, B, C, D).
    f.  HU# 6: General population inmates, closed housing, 3 tiers (A, B, C).
    g.  HU# 7: Segregation unit, 4 tiers (A, B, C, D).
    h.  HU# 8: General population, closed housing, 4 tiers (A, B, C, top D).
    i.  Bottom tier of D is designated for intake/temporary housing such as parole retakes and transportation layovers.

25.     Additionally, two off-site units, the Harold E. Donnell Building ("HED") and Emergency Housing Unit ("EHU"), are located on MCTC grounds, separately fenced from the main unit.

7

26.     HED houses inmates in the Pre-Release Program or minimum-security unit with three tiers and ten monitoring cameras.

27.     While all housing units are designed to provide privacy for inmates during toileting, showering, and changing clothes through individual stalls, the facility has 290 cameras with video retention capabilities for investigative purposes.

**B.   The Position of Correctional Officer**

28.     Plaintiffs and other similarly situated individuals, as well as the 40 West Defendants, are charged with the care and custody of individuals sentenced by the courts to serve time in a State correctional facility, as well as those awaiting a court trial and sentencing.

29.     Working as a CO is a dangerous position because they work closely with incarcerated individuals in their living quarters to oversee and monitor their daily activities.

30.     COs are responsible for recording the events of each day and making a note of any confrontations and/or other issues and have the authority to confiscate contraband and determine when to discipline inmates who break protocol.

31.     Other duties of COs, such as Plaintiffs and other similarly situated individuals, include, but are not limited to:

    a.  Enforcing rules of conduct and regulations inside correctional settings;
    b.  Maintaining security and safety by preventing disturbances, assaults, and escapes;
    c.  Supervising the daily activities of incarcerated individuals, ensuring all rules and procedures are followed;
    d.  Ensuring whereabouts of incarcerated individuals at all times;
    e.  Searching incarcerated individuals for contraband, such as weapons or drugs;
    f.  Subduing and restraining incarcerated individuals during fights, riots, and escape attempts;
    g.  Inspecting correctional facilities to ensure standards are met;
    h.  Reporting on incarcerated individuals' conduct;
    i.  Restraining incarcerated individuals in handcuffs when necessary;
    j.  Aiding in the rehabilitation and counseling of incarcerated individuals;
    k.  Inspecting mail and visitors for prohibited items;

8

l.  Writing incident reports and filling out daily activity logs;
m. Inspecting cells for unsanitary conditions, contraband, and any signs of security breaches; and
n.  Operating manual and electronic cell locking systems.

## C. 40 West

32.    In or about 2018 through the present, a number of POCs and immigrants were hired at MCTC as COs.

33.    Prior to their recent hire, all and/or nearly all of the COs at MCTC were Caucasian.

34.    Upon information and belief, a group of Caucasian COs organized to engage in illegal behavior and to take administrative control of MCTC creating a race-based gang called "40 West", "40 West Boys", and/or "40 West Gang" decades prior to the present.

35.    Upon information and belief, "40 West" members have appropriated masonic imagery as a way to identify each other as part of the gang.

36.    The 40 West Defendants are known and unknown members of "40 West" who engage in coordinated activities to provide mutual support and assistance to each other within the workplace, including, but not limited to, promotion of their members even when unjustified, assignment to the most desirable work posts, exemption from weekend work shifts, preferential and fraudulent assignment of overtime shifts, and avoidance of disciplinary action.

37.    Further, the 40 West Defendants have been known to smuggle contraband (i.e., tobacco) into MCTC for both personal use and sale to inmates.

38.    The unknown members of "40 West", included in this suit herein as "John Does", are specific individuals employed by DPSCS at the MCTC compound in the position of CO that have knowledge of the coordinated activities described above and have engaged in those same activities.

39.     Further, the "John Doe" Defendants includes those individuals who worked as Desk

Correctional Officer Lieutenants during the relevant period of this lawsuit, called COs for overtime

opportunities via additional shifts, and ignored the "seniority list" provided to equitably organize

the process for selecting COs for overtime opportunities and which COs, such as Plaintiffs and

other similarly situated individuals, relied upon.

40.     For particularity, the unknown 40 West Defendants, designated as "John Does",

may include the following individuals whose involvement with the group will be established or

not established through reasonable discovery into the matter:

(i)       Major Jeffery Bradshaw;
(ii)      Major Joel Wilt;
(iii)     Lieutenant Wayne L. Rudisill
(iv)      Lieutenant Janet Hall;
(v)       Lieutenant Johnavin McKinley;
(vi)      Lieutenant Steven Pryor;
(vii)     Lieutenant Jamie L. Exline;
(viii)    Lieutenant Jeffery Golden;
(ix)      Lieutenant Paul Anderson;
(x)       Lieutenant Willis Hendershot;
(xi)      Lieutenant Kevin Brown;
(xii)     Lieutenant Brandon L. Guyer;
(xiii)    Lieutenant Kevin R. Tew;
(xiv)     Lieutenant Eric L. Kretzer;
(xv)      Lieutenant Wilmont Bair;
(xvi)     Lieutenant Harold B. Hall;
(xvii)    Captain Brian L. Spickler;
(xviii)   Captain Michael A. Cunningham;
(xix)     Captain Charles Conley;
(xx)      Captain Brian W. Whiteside;
(xxi)     Sergeant Trenton G. Helmstetter;
(xxii)    Sergeant Derek A. McBee;
(xxiii)   Sergeant Wayne H. Weeks.

41.     While a reasonable basis exists to include the aforementioned individuals as parties

in this matter as members of "40 West" based upon the observations and lived experiences of the

Plaintiffs, in the interests of judicial economy and efficiency, Plaintiffs will investigate in

discovery whether these individuals conspired with and/or carried out actions in furtherance of the "40 West" conspiracy to discriminate, retaliate, fraudulently acquire overtime compensation, and/or commit other overt acts against Plaintiffs and other similarly situated individuals as described further herein.

42.     The 40 West Defendants occupy high ranking positions at MCTC and DSPCS engaged in the operation and management of both entities, including, but not limited to, the positions of Warden and Security Chief at MCTC.

43.     Upon information and belief, the Warden previous to Defendant Bohrer was also a member of "40 West".

44.     Plaintiffs assert that the preferential treatment of the 40 West Defendants is blatant and contributes to a severe and pervasive hostile work environment for POCs, immigrants, and others who do not and cannot belong to the group.

45.     Further, the 40 West Defendants have conspired amongst themselves and others and/or committed overt acts to injure, oppress, threaten, and/or intimidate Plaintiffs and other similarly situated individuals so that they will not be promoted, receive overtime opportunities, and/or receive arms cards.

46.     The 40 West Defendants have further conspired amongst themselves and others to injure, oppress, threaten, and/or intimidate Plaintiffs and other similarly situated individuals because of their protected statuses, including race and national origin.

47.     The 40 West Defendants have further conspired amongst themselves and others and/or committed overt acts to injure, oppress, threaten, and/or intimidate Plaintiffs and other similarly situated individuals because they engaged in a protected activity and/or opposed conduct

11

they reasonably believed to be unlawful related to the treatment they were subjected to on the basis of their protected status, including race and national origin.

48.     The 40 West Defendants have further conspired amongst themselves and others and/or committed overt acts to defraud Plaintiffs and other similarly situated individuals through a scheme involving wires which was aimed at acquiring overtime wages from Plaintiffs and other similarly situated individuals by wholly ignoring the use of, refusing to use, and/or otherwise failing to use a "seniority list", which Plaintiffs and other similarly situated individuals relied upon, to select individuals for overtime shifts and instead awarding overtime shifts to members of the 40 West Defendants and/or other Caucasian COs.

49.     The 40 West Defendants would fraudulently communicate to Plaintiffs and other similarly situated individuals through wires when they inquired as to a lack of overtime opportunities that they were ineligible for overtime because it was not their turn pursuant to the "seniority list".

50.     In other circumstances, the 40 West Defendants would perpetuate their fraudulent scheme through the wires by communicating to other members of "40 West" and/or other Caucasian COs that overtime opportunities were available if they wanted them without regard to any "seniority list".

51.     The aforementioned conspiracies and preferential or discriminatory treatment in furtherance of the aforementioned conspiracies constitute a general policy, pattern, and/or practice such that DPSCS, and MCTC more specifically, operated under a general policy of discrimination.

D. **Policies And Laws**

52.     DPSCS, as a state agency in Maryland, and its personnel are obliged to comply with the Fourteenth Amendment to the United States Constitution, which guarantees equal protection of the laws to all citizens.

53.     Any violation of this amendment may give rise to legal recourse under 42 U.S.C. § 1983, which safeguards against the denial of constitutional rights and privileges by individuals acting under the color of law.

54.     In addition, DPSCS and its personnel are bound by 42 U.S.C. § 1981, which ensures that everyone has the right to make and enforce contracts, including employment contracts, without discrimination based on race. This law also protects against the infringement of any constitutional rights, privileges, or immunities by individuals acting under the guise of law. The right to be free from racial discrimination, harassment, and retaliation for asserting one's civil rights are all established rights that DPSCS recognizes.

55.     Further, DPSCS and its personnel are bound by 42 U.S.C. § 1985 which ensures that individuals are protected against conspiracies to interfere with civil rights and the neglect to prevent such conspiracies. These provisions hold accountable those involved in coordinated efforts to violate civil rights and impose a duty on individuals who have knowledge of such conspiracies to take appropriate action. By adhering to 42 U.S.C. § 1985, DPSCS is required to uphold the rights of individuals and prevent or address civil rights violations within its jurisdiction.

56.     DPSCS and its personnel are required to adhere to Title VII of the Civil Rights Act of 1964, which prohibits employers from discriminating against employees based on their race and national origin. The law also prohibits retaliation against employees who report such discrimination.

57.     Additionally, DPSCS and its personnel must follow Title 20 of the Maryland Human Relations Act, which makes it unlawful to discriminate against employees based on their race and national origin and prohibits retaliation against employees who report such discrimination.

58.     Further, DPSCS and its personnel are bound by 18 U.S.C. 1961, *et seq.*, which makes it unlawful to commit specific acts, including fraud and retaliation, termed "racketeering" in conjunction with the operation of an enterprise, such as MCTC, and conspiring to commit the same.

59.     DPSCS agents, servants, and/or employees have established rights to be free from racial discrimination in employment, from retaliation for asserting their civil rights, and from unlawful schemes and conspiracies to deprive them of their property which the agency and its personnel are reasonably aware of.

60.     DPSCS policy assures its employees that it is committed to providing equal employment opportunities to all qualified individuals, regardless of their sex, age, ancestry, race, color, creed, gender identity/expression, national origin, religious affiliation, belief or opinion, sexual orientation, marital status, genetic information, or disability. The agency also states that it does not tolerate any form of harassment or retaliation against employees who report discrimination. Moreover, DPSCS prohibits any threats or acts of retaliation against witnesses who testify regarding discrimination or harassment.

**E.  Discipline**

61.     Plaintiffs allege that they and other similarly situated individuals experienced unequal and harsher discipline compared to Caucasian officers, in violation of 42 U.S.C. §§ 1981, 1983, 1985, and Title VII, and MFEPA. The following facts support the Plaintiffs' claims.

14

62.     Caucasian officers engaging in misconduct are not disciplined, while POCs and immigrants are targeted for unwarranted discipline and/or minor infractions, resulting in disparate treatment based on race and national origin.

63.     Caucasian officers routinely engage in misconduct and more serious actions without facing consequences including, but not limited to:

       a.   Travis S. Nichols ("Mr. Nichols"), whose locker contained thousands of dollars' worth of drugs, K2, and suboxone, and another officer who had sexual relations with an inmate. Both Mr. Nichols and this other officer remain employed by DPSCS at MCTC.

       b.   Caucasian officers, including the 40 West Defendants and other members of "40 West", have also been observed bringing contraband, such as food and tobacco, into the workplace.

64.     Upon information and belief, Defendant Lohman, MCTC's Security Chief, and Defendant Bohrer, MCTC's Warden, are attempting to find excuses to terminate Plaintiffs' employment and/or force them into an involuntary quit due to their complaints of discrimination against the 40 West Defendants and others.

65.     Plaintiffs and other similarly situated individuals have experienced unwarranted scrutiny and attempts to terminate them and/or force them to quit under false or exacerbated reasons.

66.     DPSCS has a pattern or practice of imposing unduly harsh and excessive discipline upon POCs and immigrants, which is not applied to similarly situated Caucasian officers.

67.     DPSCS has a pattern or practice of disciplining POCs and immigrants for minor, negligible, and/or non-existent violations of its policies.

68.     These disciplinary actions exceed the recommended discipline for such alleged infractions as set forth in DPSCS' policies.

69.    DPSCS has a pattern or practice of taking lengthy times to investigate, charge, and process disciplinary actions against POCs and immigrants, time which is not justified by the subject matter, facts, or policy, resulting in extending the lost income and/or reputational harms to POC in the disciplinary process.

70.    DPSCS does not subject similarly situated Caucasian officers to comparable discipline for similar or even more severe offenses. In fact, DPSCS has a pattern or practice of declining to charge or investigate Caucasian officers for known and/or alleged misconduct.

71.    The disparate discipline Plaintiffs and other similarly situated individuals faced includes, but is not limited to, actions from DPSCS' centralized office tasked with assessing potential officer misconduct (such as Defendant Bohrer), determining whether to propose discipline against an officer, and deciding the type and degree of discipline to propose for an officer.

72.    Based on these allegations, Plaintiffs claim that the unequal and harsher discipline they and other similarly situated individuals experienced compared to similarly situated Caucasian officers constitutes a violation of 42 U.S.C. §§ 1981, 1983, 1985, and Title VII, and MFEPA.

### F. **Pay And Promotions**

73.    Plaintiffs allege that they and other similarly situated individuals experienced unequal and harsher discipline compared to Caucasian officers, in violation of 42 U.S.C. §§ 1981, 1983, 1985, and Title VII, MFEPA, and RICO. The following facts support the Plaintiffs' claims.

74.    DPSCS has engaged and continues to engage in a systemic pattern or practice of denying POC and immigrants promotions, resulting in disproportionally fewer POC and immigrants at MCTC.

75.     DPSCS has centralized procedures meant for evaluating officers for promotion that

have a disparate impact on POCs, and immigrants.

76.     Disparities in education, performance, experience, or any other legitimate, non-

discriminatory reason cannot explain the disparity in promotions for POCs, and immigrants.

77.     DPSCS offers various positions within the correctional hierarchy, each with

different levels of responsibility:

   a. The entry-level position is Correctional Officer I ("CO I"), followed by
    Correctional Officer II ("CO II").

   b. As officers progress in their careers, they may advance to Correctional Officer
    Sergeant ("COS"), Correctional Officer Lieutenant ("COL"), and Correctional
    Officer Captain ("COC").

   c. The higher-ranking positions include Correctional Officer Major ("COM" and
    Correctional Security Chief ("CSC").

   d. In this Complaint, the positions of COS, COL, COC, COM, and CSC are
    referred to as Ranking Officers ("ROs").

78.     Most, if not all, promotions to an RO position require COs to work for a minimum

amount of time at DPSCS before becoming eligible for promotion.

79.     This policy is not job-related and consistent with business necessity.

80.     This policy disproportionately affects POCs, and immigrants at MCTC, who may

be less likely to have worked for the required period due to historical disparities in hiring and/or

other barriers to entry.

81.     Consequently, this policy systematically excludes POCs and immigrants from

promotional opportunities, thereby violating Title VII and MFEPA.

82.     Further, DPSCS fails to administer promotional tests on a regular basis, which has

a disparate impact on other POCs, and immigrants, which is evidenced by the paucity of POCs

holding ranks above CO I or CO II.

83.     The infrequent administration of promotional tests unfairly limits the chances for POCs, and immigrants to advance, particularly in light of the limited availability of other promotional opportunities.

84.     Moreover, this practice may contribute to biases in the selection process, as supervisors are more likely to rely on subjective evaluations rather than objective criteria when making promotional decisions.

85.     DPSCS creates promotion lists for individual facilities, which disproportionately excludes other POCs, and immigrants from promotional opportunities.

86.     These lists are developed using criteria that systematically disadvantage POCs, and immigrants for several reasons, including, but not limited to, that there is a historical lack of diversity at MCTC.

87.     Further, the 40 West Defendants possess a degree of control over the promotional tests and lists and exercise and/or conspire to exercise that control so as to deny promotions to POCs and immigrants and to promote their own members.

88.     This practice from DPSCS and the 40 West Defendants had the direct result of fewer and/or no POCs, and immigrants being promoted.

89.     This is clear by looking at the ROs at the facility, as POCs, and immigrants are underrepresented and/or are not currently represented at the Sergeant level and above.

90.     In a facility with nearly 3,000 inmates where, upon information and belief, there have only been one or two POCs holding a position above CO II in the last 5 years, these practices perpetuate racial inequality, are directly discriminatory, and are in direct violation of 42 U.S.C. §§ 1981, 1983, 1985, Title VII, and MFEPA.

**i.   Weapons Training**

91.    COs who have completed weapons training and obtained an arms card are granted the authority to carry out tasks that their counterparts without arms cards cannot perform. As a result, COs with an arms card have access to more opportunities for career advancement. This includes, but is not limited to, escorting inmates to court hearings, medical facilities, classrooms, and/or recreational areas.

92.    Weapons training is a significant advantage for a CO in terms of obtaining more opportunities at work. The ability to use firearms and proficiency in weapons handling can create new responsibilities and enhance an officer's career prospects within the correctional system.

93.    Examples of enhanced career opportunities and benefits include, but are not limited to:

   a.  ***Monetary bonus:*** Weapons Certified Officers are eligible for a $500.00 bonus.

   b.  ***Trip duty qualification:*** A correctional officer with weapons training is qualified to perform escort duty, as they will be able to fulfill the requirement of being experienced in using firearms. This knowledge is essential for maintaining security during the transportation of inmates.

   c.  ***Probationary officer supervision:*** A correctional officer with weapons training is equipped to provide supervision to probationary officers who are assigned to escort duty. This mentoring role allows experienced officers to share their expertise and knowledge with newer officers, helping them become proficient in their duties.

   d.  ***Increased trust and responsibility:*** Having weapons training can instill confidence in the warden and other supervisors, leading to increased trust and responsibility for the officer. This can result in more opportunities for career advancement and higher-level assignments within the institution.

   e.  ***Courtroom security:*** A correctional officer with weapons training can ensure that restraint devices remain on an inmate while in a courtroom unless the presiding judge or magistrate orders otherwise. This ability to maintain a secure environment is critical for the safety of all parties involved during court proceedings.

19

f. ***Outside medical facility security:*** When escorting an inmate to an outside medical facility, a correctional officer with weapons training can more effectively maintain security by ensuring proper restraint procedures, supervising inmate behavior, and coordinating with medical facility security personnel. Additionally, a well-trained officer will be able to make informed decisions regarding an inmate's access to items, telephone calls, and visits while in a medical facility.

94.     The 40 West Defendants possess a degree of control over the arms card tests and lists and exercise and/or conspire to exercise that control so as to deny promotions to POCs and immigrants and to grant arms cards to their own members.

95.     The 40 West Defendants prevented and/or conspired to prevent POCs, and immigrants from obtaining arms cards at the same rate as Caucasian officers, while prioritizing "40 West" members and Caucasian officers for arms card training which resulted in unequal treatment based on race and national origin.

96.     This unequal treatment denies POCs, and immigrant COs access to the same opportunities, resources, and career advancement that their similarly situated Caucasian counterparts enjoy.

97.     The aforementioned pattern or practice is in direct violation of 42 U.S.C. §§ 1981, 1983, 1985, Title VII, and MFEPA.

**ii. Overtime Opportunities**

98.     MCTC operates in a series of 3 shifts: 12:00 AM to 8:00 AM; 8:00 AM to 4:00 PM; and 4:00 PM to 12:00 AM.

99.     Overtime is permitted when a CO is selected and opts to take an additional shift.

100.    The ability to earn overtime allows COs an opportunity to significantly boost their compensation through overtime earnings.

101.    COs are supposed to be called in accordance with their respective seniority pursuant to a published "seniority list" when an opportunity to work an additional shift arises by the "Duty COL".

102.    All of the "Duty COLs" are members of "40 West" and/or support "40 West".

103.    Further, COs who are "on-shift" are supposed to be given priority, meaning that a CO who is working the 12:00 AM to 8:00 AM shift should be alerted when an opportunity arises to work the following 8:00 AM to 4:00 PM shift.

104.    The 40 West Defendants, in whole or in part, possess a degree of control over the process by which COs are selected for additional shifts.

105.    The 40 West Defendants, in whole or in part, exercise and/or conspire to exercise this control by ordaining a program whereby the "Duty COLs" select members of "40 West" and/or Caucasian COs for additional shifts more frequently than required per the "seniority list" which the Plaintiffs and other similarly situated individuals relied upon as being an accurate hierarchy for overtime shifts.

106.    Additionally, POCs, and immigrants, when they are called for additional shifts, are provided with undesirable and/or dangerous posts.

107.    The practice of the 40 West Defendants, in whole or in part, has caused Plaintiffs and other similarly situated individuals to be deprived of overtime compensation for additional shifts they should have worked but did not work because the "Duty COL" would select a different individual, normally a member of "40 West", for that overtime shift.

108.    The 40 West Defendants' actions to purposely and fraudulently deprive Plaintiffs and other similarly situated individuals of compensation is a direct violation of RICO, and their

21

actions have directly led to the liability of DPSCS under 42 U.S.C. §§ 1981, 1983, 1985, Title VII, and MFEPA.

### iii. Posts

109.    MCTC operates by having its COs work at specific posts within the facility ranging from surveilling a tier of an HU, to surveilling inmates from a watchtower, to transporting inmates to and from the facility for various reasons.

110.    The 40 West Defendants, in whole or in part, possess a degree of control over the operations and/or management of MCTC, including the assignment of COs to specific posts.

111.    The 40 West Defendants, in whole or in part, exercise and/or conspire to exercise their control by selecting members of "40 West" and/or Caucasian COs for desirable posts with minimal inmate interaction, such as watchtower posts. Because their concerted activity is in violation of 42 U.S.C. §§ 1981, 1983, 1985, Title VII, and MFEPA, DPSCS is also liable for violations of these statutes.

### G. **Retaliation**

112.    Plaintiffs allege that they and other similarly situated individuals experienced retaliation for engaging in a protected activity, in violation of 42 U.S.C. §§ 1981, 1983, 1985, and Title VII, MFEPA, and RICO. The following facts support the Plaintiffs' claims.

113.    DPSCS has a stated policy of non-discrimination and encourages employees to report any allegations of discrimination to the DPSCS' Office of Fair Practice.

114.    DPSCS is bound by federal, state, and local laws which prohibit retaliating against employees who make protected complaints of discrimination. However, DPSCS routinely and systematically fails to protect POCs and immigrants who make protected complaints of discrimination and are targeted by the 40 West Defendants and other members of "40 West".

115.     When POCs and immigrants complain of discrimination, DPSCS's Office of Fair Practice exhibits a pattern or practice of concluding that no discrimination has occurred, despite evidence presented, as well as a pattern or practice of ignoring and overlooking examples of overt racism.

116.     DPSCS does not protect officers who complain, and COs who have followed policy and lodged complaints have been targeted for unwarranted discipline, prohibited from working overtime, and banned from certain posts as a result of their complaints. This further demonstrates the systemic failures in treating POCs and immigrants fairly.

117.     In addition, DPSCS, specifically the 40 West Defendants and other "40 West" members, has a pattern or practice of retaliating against POCs and immigrants for complaining about, or proposing discipline for, Caucasian officers who commit misconduct.

118.     Further, the 40 West Defendants have, in their official and individual capacity, retaliated and/or conspired to retaliate against Plaintiffs and other similarly situated individuals for complaining of discrimination.

119.     Upon information and belief, Defendant Lohman, MCTC's Security Chief, and Defendant Bohrer, MCTC's Warden, are attempting to find excuses to terminate Plaintiffs' employment and/or force them to quit because of their complaints of discrimination against individual COs and/or because of their respective protected classes.

120.     Upon information and belief, Defendant Lohman and Defendant Bohrer have attempted, are attempting, and/or will attempt to find excuses to terminate other similarly situated POC and immigrant COs' employment and/or force them to quit because of their complaints of discrimination against individual COs and/or because of their respective protected classes.

23

121.     This retaliation perpetuates racial inequality, is directly discriminatory, and is in direct violation of 42 U.S.C. §§ 1981, 1983, 1985, Title VII, MFEPA, and RICO.

**H. Harassment And Hostile Work Environment**

122.     Plaintiffs allege that they and other similarly situated individuals experienced retaliation for engaging in a protected activity, in violation of 42 U.S.C. §§ 1981, 1983, 1985, and Title VII, and MFEPA. The following facts support the Plaintiffs' claims.

123.     Since the inception of their tenures at the Maryland Correctional Training Center, the Plaintiffs, along with other officers of color, have been subjected to incessant racial harassment. This abuse manifested in numerous forms, including use of the "N-word" and derogatory terms such as "wigger" and "trash pandas"—a modern reiteration of the historically offensive term "coon." Many Caucasian officers call POCs, especially black officers and immigrants by their names, opting instead to use derogatory terms like "Rookie" or "Rookie African," regardless of the rank of POC and immigrant CO. These derogatory expressions are common throughout the institution from colleagues and superiors alike.

124.     Furthermore, the offensive racial slurs have been brazenly used by and among non-black officers within the hearing range of their black counterparts and other officers of color at DPSCS. Such openly hostile and unwelcome language significantly contributed to a toxic work environment that adversely affected minority officers.

125.     The relentless racial taunts, unfortunately, formed part of the daily experience of officers of color, with co-workers, managers, and supervisors participating in this offensive conduct. Phrases such as "[w]e don't want Blacks here," and "[g]o back to your country," were cruelly directed towards these officers, forming a stark reminder of their perceived inferiority.

126.    Adding to the toxicity, the institution was a stage for disrespectful acts such as mimicking monkey noises over the intercom system, particularly targeting African and black officers. A visible symbol of hate, a swastika tattoo adorned at least one officer, highlighting the appalling level of racial discrimination prevalent in the facility.

127.    This hostile and unwelcome conduct was met with resistance from the Plaintiffs and similarly affected employees who raised numerous objections and complaints to the management of DPSCS. Despite their efforts, these concerns were largely ignored, allowing the racial harassment to persist.

128.    DPSCS, holding authority over its employees' terms and conditions of employment, was not ignorant of the complaints made by its aggrieved employees. They assured they would investigate the complaints and follow-up. Still, their inaction betrayed these assurances, leading to a failure to correct the racially hostile conduct rampant in their jurisdiction.

129.    DPSCS has control of the terms and conditions of employment for its employees.

130.    DPSCS claimed to accept complaints made by its employees and asserted that when complaints were made, it would investigate the complaints and follow up. However, DPSCS failed to use its control over its worksite to investigate and correct the conduct that occurred and failed to protect the Plaintiffs from this severe and pervasive harassment.

131.    This hostile work environment perpetuates racial inequality, is directly discriminatory, and is in direct violation of 42 U.S.C. §§ 1981, 1983, 1985, Title VII, and MFEPA.

### FACTUAL ALLEGATIONS COMMON TO ALL RICO COUNTS

132.    Pursuant to 18 U.S.C. 1962(c), a RICO claim must include: (1) individual conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Further, a civil RICO claim must show injury "by reason of" the RICO violation.

133.    **Individual Conduct:** The 40 West Defendants have engaged in the operation

and/or management of an enterprise and/or multiple enterprises over a period of years, if not

decades. All of the 40 West Defendants are ROs with supervisory and managerial duties and

responsibilities that operate and manage the MCTC compound for the benefit of DPSCS. The 40

West Defendants are natural born individuals who are capable of holding a legal and/or beneficial

interest in property.

134.    **Enterprise:** There are two (2) enterprises plead within this Complaint in the

conjunctive and/or alternative. Should one (1) alleged enterprise be determined not to be an

enterprise within the meaning of 18 U.S.C. 1961, *et seq.* then any claim arising from that enterprise

should be dismissed and any claims related to an alleged enterprise determined to be an enterprise

within the meaning of 18 U.S.C. 1961, *et seq.* should be permitted to proceed. The two (2)

enterprises in this matter are:

a.  ***The DPSCS Enterprise***: DPSCS is a legal government entity which was cre-
ated by the State of Maryland to operate and run numerous prisons within the
State of Maryland. The DPSCS Enterprise is separate and distinct from the 40
West Defendants. The 40 West Defendants are employed by the DPSCS Enter-
prise. The 40 West Defendants, specifically Defendant Bohrer, are directly en-
gaged in the management and operation of the DPSCS Enterprise.

b.  ***The MCTC Enterprise***: MCTC is a legal entity and/or a group of individuals
associated in fact for the common purpose of operating the MCTC compound.
The MCTC Enterprise is separate and distinct from the 40 West Defendants.
The 40 West Defendants are employed at and/or are associated with the MCTC
Enterprise. The 40 West Defendants, specifically Defendants Bohrer and
Lohman, are directly engaged in the management and operation of the DPSCS
Enterprise.

135.    **Interstate Commerce:** The DPSCS Enterprise and MCTC Enterprise are engaged

in interstate commerce by virtue of the fact that both Enterprises hire and/or employ individuals

who are not within the State of Maryland. By way of example, Plaintiff Britto resides in the State

of West Virginia. The 40 West Defendants further entangle the enterprise in interstate commerce

through its continuing pattern of racketeering activity, including, but not limited to, the distribution of contraband, such as tobacco and controlled substances, throughout the MCTC compound which was gained through the stream of interstate commerce.

136. **Racketeering Activity:** The 40 West Defendants have conducted the business of the DPSCS and MCTC Enterprises through a continuing pattern of racketeering activity over the last ten (10) years with the last act occurring within the last four (4) years. Specifically, the 40 West Defendants have violated 18 U.S.C. 1961, *et seq.* by:

a. Delivering contraband to a person detained and/or confined in MCTC in violation of Md. Code Ann., Crim. Law § 9-412(a)(1);

b. Possessing contraband with intent to deliver it to a person detained and/or confined in MCTC in violation of Md. Code Ann., Crim. Law § 9-412(a)(2);

c. Knowingly possessing contraband in MCTC in violation of Md. Code Ann., Crim. Law § 9-412(a)(3);

d. Delivering a controlled dangerous substance to a person detained or confined in MCTC in violation of Md. Code Ann., Crim. Law § 9-416(a)(1);

e. Possessing a controlled dangerous substance with the intent to deliver it to a person detained and/or confined in MCTC in violation of Md. Code Ann., Crim. Law § 9-416(a)(2);

f. Knowingly using and/or attempting to use intimidation, threats, corrupt persuasion, and/or misleading conduct with the intent to influence, delay, and/or prevent the testimony of Plaintiffs and others in official proceedings in violation of 18 U.S.C. § 1512(b)(1);

g. Intentionally harassing Plaintiffs and thereby hindering, delaying, preventing, and/or dissuading Plaintiffs from attending and/or testifying in an official proceeding in violation of 18 U.S.C. § 1512(d)(1);

h. Perpetuating a wire fraud against Plaintiffs and other similarly situated individuals by forwarding materially false communications to Plaintiffs and other similarly situated individuals that they were not eligible for overtime shifts because it was not their turn according to an alleged "seniority list" and thereby denying Plaintiffs and other similarly situated individuals overtime compensation which they would have received in violation of 18 U.S.C. § 1343;

i.   Other crimes which may reasonably be determined to have occurred through investigation during the discovery period of this matter.

137.   **Injury:** The 40 West Defendants have injured the Plaintiffs and other similarly situated individuals in various ways including, but not limited to:

a.   Plaintiff Grant being denied overtime for a period of several months by reason of his engagement in a protected activity related to the conduct of one and/or all of the 40 West Defendants;

b.   Plaintiff Guy being suspended without pay for several days by reason of his engagement in a protected activity related to the conduct of one and/or all of the 40 West Defendants;

c.   All Plaintiffs who were denied and/or not selected for overtime opportunities by reason of their engagement in a protected activity related to the conduct of one and/or all of the 40 West Defendants;

d.   All Plaintiffs and other similarly situated individuals who were denied overtime opportunities and compensation because of the wire fraud scheme of the 40 West Defendants;

e.   Other injuries which may reasonably be determined to have occurred through investigation during the discovery period of this matter.

## V. INDIVIDUAL PLAINTIFFS' FACTS

### A. Plaintiff Grant

138.   Plaintiff Grant started his employment at DPSCS as a CO I on or about January 13, 2021.

139.   From the beginning of his employment through the present, he has held the title of CO I and CO II.

140.   Plaintiff Grant successfully completed the rigorous qualifications and screening process to become a CO, which included submitting an application, passing a three-person interview panel, a writing sample assessment, undergoing a comprehensive background screening, and completing a psychological evaluation, physical examination, drug screening, and polygraph.

141.   Plaintiff Grant currently works at MCTC.

142.    Throughout his employment with DPSCS, Plaintiff Grant has been subjected to a severe and pervasive pattern or practice of harassment and discrimination because of and/or motivated in part by his race (black), national origin (Sierra Leone), and retaliation for engaging in a protected activity while working at MCTC. This harassment and discrimination include, but is not limited to:

   a.   On or about September 7, 2021, while Plaintiff Grant was waiting in the breakroom for his next assigned post, a chair was thrown at him by Defendant Durboraw while his back was turned. Defendant Durboraw accused Plaintiff Grant of sleeping, but contrary to the accusation, Plaintiff Grant was not sleeping. Even so, Plaintiff Grant has witnessed numerous Caucasian officers sleeping on duty without discipline. In this incident, not only did Defendant Durboraw attempt to physically harm Plaintiff Grant, he screamed at him in front of the other COs in the break room at that time. Following this, he forced Plaintiff Grant – as punishment – to stand in the sun on a very hot day. Plaintiff Grant has never witnessed Defendant Durboraw behave this way towards Caucasian officers.

   b.   After the previously mentioned incident, Defendant Durboraw threatened to write up Plaintiff Grant because he wore sneakers. Almost all COs wear sneakers, as they are COs are required to run in case of an emergency and are normally standing for long periods of time.

143.    Furthermore, Plaintiff Grant has been retaliated against by DSPCS and the 40 West Defendants whenever he has attempted to complain and/or when he actually submitted a complaint regarding the severe and pervasive pattern or practice of harassment and discrimination.

144.    Plaintiff Grant has been subjected to the same harassing environment as other POC at MCTC, and some examples of harassment and discrimination against him include, but is not limited to:

   a.   In or about October 2021, Plaintiff Grant filed a complaint of discrimination against Defendant Durboraw for the September 7, 2021 incident. In retaliation, shortly thereafter, Plaintiff Grant was charged with violating the Standards of Conduct and Performance. When discussing this disciplinary charge with Defendant Lohman, Plaintiff Grant was told that he was "lucky" to still have his job.

b. On or about December 27, 2022, Plaintiff Grant was called by Defendant Garlitz into his office for a meeting. Captain Michael A. Cunningham ("Cpt. Cunningham") was present during this meeting. During this meeting, Plaintiff Grant was told that he would not be able to work overtime for the next 6 months because Defendant Garlitz gave him an unsatisfactory rating. When Plaintiff Grant questioned why he was receiving a rating and being denied the opportunity for overtime, he was told that it was because (1) other officers told Defendant Garlitz that Plaintiff Grant was not speaking about them in a nice way; (2) Plaintiff Grant continued to wear sneakers; and (3) other officers were mad at Plaintiff Grant for filing complaints regarding discriminatory treatment.

c. In or about October 2022, Plaintiff Grant was working in HU# 7, which Sergeant Jeremy Wright ("Sgt. Wright") was in charge of at that time. When Plaintiff Grant was in the breakroom, Sgt. Wright found Plaintiff Grant, cursed at him, and told him to leave HU #7 because he did not want to work with him. Plaintiff Grant believes this is because he had filed a complaint regarding discriminatory treatment against members of "40 West".

145. In addition to the various discrete acts of discrimination and retaliation described herein, Plaintiff Grant was subjected to a hostile work environment typified by the daily habitual and routine use of racial epithets and derogatory remarks aimed at himself and other similarly situated individuals by the 40 West Defendants.

146. In or about January 2022, Plaintiff Grant reached out to Genice Fowler ("Ms. Fowler"), the Assistant to the Director at DPSCS. Despite telling Ms. Fowler about the harassment and discrimination he faced, his complaints were not investigated.

147. Plaintiff Grant has repeatedly filed complaints due to the intolerable discrimination, harassment, and retaliation. This has not led to an improvement in his treatment, in fact, since filing his complaints he has been told that he cannot work certain positions because of his complaints. He has been banned from working overtime based in direct retaliation for his complaints and has been singled out for discipline in retaliation for his complaints.

**B. Plaintiff Britto**

148. Plaintiff Britto started his employment at DPSCS as a CO I in or about March 2019.

30

149.    From the beginning of his employment through the present, he has held the title of CO I and CO II.

150.    Plaintiff Britto successfully completed the rigorous qualifications and screening process to become a CO, which included submitting an application, passing a three-person interview panel, a writing sample assessment, undergoing a comprehensive background screening, and completing a psychological evaluation, physical examination, drug screening, and polygraph.

151.    Plaintiff Britto currently works at MCTC.

152.    Throughout his employment with DPSCS, Plaintiff Britto has been subjected to a severe and pervasive pattern or practice of harassment and discrimination because of and/or motivated in part by his national origin (Nigeria), race (black), and ethnicity while working at MCTC.

153.    Plaintiff Britto has been subjected to the same harassing environment as other POC at MCTC, and some examples of harassment and discrimination against him include, but is not limited to:

> a. On or about March 7, 2022, Plaintiff Britto entered the gatehouse to clock out and leave MCTC for the day. Defendant Durboraw was waiting to clock out. Defendant Durboraw snapped at Plaintiff Britto several times about where his mask was. Plaintiff Britto told Defendant Durboraw that he was leaving the facility and Defendant Durboraw told Plaintiff Britto that he would make it worse for himself, insinuating that Plaintiff Britto was "backtalking" to him.Defendant Durboraw told Britto "you are making it worse for your self,"and then said I will make worse for you." As this was occurring, Sgt. Wright and "Sergeant Brooks" walked through the gatehouse without a mask without any word from Defendant Durboraw. Ultimately, Defendant Durboraw continued yelling at Plaintiff Britto and Lieutenant Eric Kretzer ("Lt. Kretzer") instructed Plaintiff Britto to leave which he did at that time.

> b. On or about November 6, 2022, Plaintiff Britto was told that his position was reassigned to HU# 7, a normal occurrence which Plaintiff Britto tolerated and believes was motivated in part by either a discriminatory animus and/or his complaints of discrimination. As Plaintiff Britto was reporting to his post, he went by the Lieutenants' Office to discuss the reassignment. When he arrived

at the Lieutenants' Office, he saw Lieutenant Johnavin McKinley ("Lt. McKinley") and Defendant Durboraw. Plaintiff Britto asked Lt. McKinley why he was reassigned and why he was not contacted directly. Defendant Durboraw began yelling at Plaintiff Britto to leave and began walking towards him. At this point, Plaintiff Britto was afraid of a physical altercation with Defendant Durboraw. Cpt. Cunningham, noticing this escalating incident, approached the group in the Lieutenants' Office and told Plaintiff Britto to leave and go to his assigned post. Plaintiff Britto complied and left the Lieutenants' Office.

c.    On or about May 20, 2023, Plaintiff Britto reported to his assigned post in HU #7. Shortly after Plaintiff Britto reported to his post, Ofc. Bryan Lee ("Ofc. Lee") approached Plaintiff Britto and demanded that he switch posts with a Caucasian CO. Plaintiff Britto informed Ofc. Lee that he had been scheduled for this specific post and Ofc. Lee began screaming and cursing at Plaintiff Britto. This conduct was so severe that Plaintiff Britto had to return home and request leave. This is but one of many incidents which Plaintiff Britto has had with Ofc. Lee which began in or about 2019.

154.    Furthermore, Plaintiff Britto has been retaliated against by DPSCS and the 40 West Defendants whenever he has attempted to complain and/or when he actually submitted a complaint regarding the severe and pervasive pattern or practice of harassment and discrimination. This retaliation includes, but is not limited to:

a.    On or about March 14, 2022, Plaintiff Britto filed an "Internal Complaint of Discrimination" related to the March 7, 2022 incident with Defendant Durboraw. On or about March 25, 2022, Plaintiff Britto received a "Level 1 Reprimand" for failing to report to work without sufficient accrued leave hours for the period of January 8, 2022 through January 18, 2022. Plaintiff Britto received this "Level 1 Reprimand" for this period despite receiving a written acknowledgment from Captain Brian Kelley ("Cpt. Kelley") on or about February 4, 2022 that no disciplinary action was being requested for that leave of absence.

155.    In addition to the various discrete acts of discrimination and retaliation described herein, Plaintiff Britto was subjected to a hostile work environment typified by the daily habitual and routine use of racial epithets and derogatory remarks aimed at himself and other similarly situated individuals by the 40 West Defendants.

## C. **Plaintiff Bangura**

156.    Plaintiff Bangura started his employment at DPSCS as a CO I on or about April 7, 2021.

157.    From the beginning of his employment through the present, he has held the title of CO I and CO II.

158.    Plaintiff Bangura successfully completed the rigorous qualifications and screening process to become a CO, which included submitting an application, passing a three-person interview panel, a writing sample assessment, undergoing a comprehensive background screening, and completing a psychological evaluation, physical examination, drug screening, and polygraph.

159.    Plaintiff Bangura currently works at MCTC.

160.    Throughout his employment with DSPCS, Plaintiff Bangura has been subjected to a severe and pervasive pattern or practice of harassment and discrimination because of and/or motivated in part by his race (black), national origin (Sierra Leone) and retaliation for engaging in a protected activity while working at MCTC.

161.    Plaintiff Bangura has been subjected to the same harassing environment as other POC at MCTC, and some examples of harassment and discrimination against him include, but is not limited to:

> a.    In or about December of 2021, Sgt. Collinsworth addressed Officer Bangura as "Rookie", instead of using his name.
>
> b.    On or about April 9, 2022, Ofc. Kevin Quackenbush ("Ofc. Quackenbush"), Ofc. Charles Ditto ("Ofc. Ditto"), and Plaintiff Bangura were sitting in Yard Post 1. The group were discussing politics and voting when Plaintiff Bangura expressed his ambivalence for voting for a specific candidate. After making this expression, Ofc. Quackenbush became very aggressive, called Plaintiff Bangura demeaning names, and told him that he should return to his country of origin. During this tirade, Ofc. Quackenbush took Plaintiff's lunchbox and threw it outside of the Yard Post. Ofc. Quackenbush then took the chairs in the Yard Post and put them outside so that Plaintiff Bangura had no where else to

sit before dragging Plaintiff Bangura himself out of the Yard Post. Throughout this entire ordeal, Ofc. Quackenbush exhibited physically threatening behavior that made Plaintiff Bangura fear for his physical safety.

c. On or about May 24, 2022, Plaintiff Bangura, Ofc. Quackenbush, and "Ofc. Usuf" were providing a lookout for inmates at or near HU #8. Ofc. Quackenbush commanded both Plaintiff Bangura and "Ofc. Usuf" to go by a trash can and simply stand there. Both Plaintiff Bangura and "Ofc. Usuf" complied, but when they arrived at the trash another CO asked why they were there and said they were not needed. Both Plaintiff Bangura and "Ofc. Usuf" then returned back to their original post and Ofc. Quackenbush began screaming at both Plaintiff Bangura and "Ofc. Usuf". Plaintiff Bangura immediately reported this unwarranted behavior to Lt. Kretzer and requested an Employment Assistance Program ("EAP") Counselor.

162.    Furthermore, Plaintiff Bangura has been retaliated against by DPSCS and the 40 West Defendants whenever he has attempted to complain and/or when he actually submitted a complaint regarding the severe and pervasive pattern or practice of harassment and discrimination. This retaliation includes, but is not limited to:

a. After filing his Charge of Discrimination on or about September 8, 2022, on or about January 27, 2023, Plaintiff Bangura was called at approximately 11:48 PM by his Lieutenant Terry Myers ("Lt. Myers") asking if he would be arriving at work for the 12:00 AM to 8:00 AM shift. Plaintiff Bangura told Lt. Myers that he would be arriving at work, but likely late by 15 to 30 minutes. Plaintiff Bangura arrived at MCTC for his shift at 12:25 AM. Plaintiff Bangura received a Level II reprimand for this delay, however, written policy is that a CO who is more than 30 minutes late will be considered "grossly late".

b. On or about March 3, 2023, Plaintiff Bangura was called to Defendant Lohman's office to discuss the January 27, 2023 incident. Defendant Lohman informed Plaintiff Bangura that he has already received other reprimands and that should he receive more he could receive a suspension and termination. Plaintiff Bangura understood these statements to be a threat to his employment with DPSCS. Plaintiff Bangura expressed his displeasure with this course of action and these statements and Defendant Lohman declared that he was being insubordinate.

163.    In addition to the various discrete acts of discrimination and retaliation described herein, Plaintiff Bangura was subjected to a hostile work environment typified by the daily habitual

and routine use of racial epithets and derogatory remarks aimed at himself and other similarly situated individuals by the 40 West Defendants.

**D.   Plaintiff Guy**

164.    Plaintiff Guy started her employment at DPSCS as a CO I in or about March of 2021.

165.    From the beginning of her employment through the present, she has held the title of CO I and CO II.

166.    Plaintiff Guy successfully completed the rigorous qualifications and screening process to become a CO, which included submitting an application, passing a three-person interview panel, a writing sample assessment, undergoing a comprehensive background screening, and completing a psychological evaluation, physical examination, drug screening, and polygraph.

167.    Plaintiff Guy currently works at MCTC.

168.    Throughout her employment with DPSCS, Plaintiff Guy has been subjected to a severe and pervasive pattern or practice of harassment and discrimination because of and/or motivated in part by her race (black) and retaliation for engaging in a protected activity while working at MCTC. Plaintiff Guy has also has separate claims for sex discrimination and sexual harassment.

169.    Plaintiff Guy has also been subjected to the same harassing environment as other POC at MCTC, and some examples of harassment and discrimination against him include, but is not limited to:

> a.   Shortly after Plaintiff Guy began her employment with DPSCS in or about March 2021, Plaintiff Guy overheard Sergeant Brent E. Little ("Sgt. Little") state that people like her should not be receiving overtime opportunities.

b. On or about August 20, 2021, Plaintiff Guy was told that a materially false rumor was circulating around the MCTC compound that she was bringing drugs into the compound.

c. On or about July 13 and 15 of 2022, Plaintiff Guy was passing through the metal detector at the entrance to the MCTC compound when Officer Billie Wheeler ("Ofc. Wheeler") told something which she could not hear to Lieutenant Dwayne Draper ("Lt. Draper") on July 13 and to Lieutenant Thomas Warrenfeltz ("Lt. Warrenfletz"). Plaintiff Guy was then stopped by the respective Lieutenants on the respective dates and told to empty her water bottle or return it to her car because such material was not allowed in the compound. During the incident which occurred on or about July 13, 2022, Plaintiff Guy encountered Defendant Lohman who insinuated that she was bringing illicit material into the compound. Plaintiff Guy told Defendant Lohman that she knew of numerous other COs who were plainly bringing in chewing tobacco and were not stopped at the metal detector by COs on duty. Plaintiff Guy received a Level 1 Reprimand for these incidents.

d. Plaintiff Guy has been subjected to unwelcome sexual comments and behavior, as well as comments relating to her ability to be a CO based on her gender.

170. Furthermore, Plaintiff Guy has been retaliated against by DPSCS and the 40 West Defendants whenever she has attempted to complain and/or when she actually submitted a complaint regarding the severe and pervasive pattern or practice of harassment and discrimination. This retaliation includes, but is not limited to:

a. After filing her Charge of Discrimination on or about September 8, 2022, on or about September 27, 2022, an investigation was opened pursuant to a materially false report that Plaintiff Guy was delivering contraband to inmates at the facility.

b. On or about October 23 through October 31, 2022, Plaintiff Guy attempted to exercise her federally guaranteed Family and Medical Leave Act ("FMLA") leave. On December 13, 2022, Plaintiff Guy received a five (5) day suspension without pay.

c. On December 10, 2022, Plaintiff Guy attempted to exercise her federally guaranteed FMLA leave for her assigned shifts on December 10 and December 11. Plaintiff Guy alerted MCTC about this use of her leave. On December 19, 2022, Plaintiff Guy received a notice via certified mail recommending her for termination.

171.   In addition to the various discrete acts of discrimination and retaliation described herein, Plaintiff Guy was subjected to a hostile work environment typified by the daily habitual and routine use of racial epithets and derogatory remarks aimed at herself and other similarly situated individuals by the 40 West Defendants. Further, Plaintiff Guy was subjected to a campaign of materially false rumors spread about her involving her alleged membership in the "Bloods" criminal gang and her alleged smuggling of contraband into the MCTC compound.

172.   The materially false rumors related to Plaintiff Guy's membership in the "Bloods" criminal gang resulted in her being investigated. The investigation was ultimately closed due to a lack of evidence.

173.   Officer Guy has also been subjected to gender discrimination, including being told to her face that "sorry, females just don't belong" and enduring comments about her body and what sexual acts other officers would do to her.

**E.  Plaintiff Lovelace**

174.   Plaintiff Lovelace started her employment at DPSCS as a CO I on or about April 7, 2021.

175.   From the beginning of her employment through the present, she has held the title of CO I and CO II.

176.   Plaintiff Lovelace successfully completed the rigorous qualifications and screening process to become a CO, which included submitting an application, passing a three-person interview panel, a writing sample assessment, undergoing a comprehensive background screening, and completing a psychological evaluation, physical examination, drug screening, and polygraph.

177.   Plaintiff Lovelace currently works at MCTC.

178.    Throughout her employment with DPSCS, Plaintiff Lovelace has been subjected to

a severe and pervasive pattern or practice of harassment and discrimination because of and/or

motivated in part by her race (black), national origin (Trinidad and Tobago), and retaliation for

engaging in a protected activity while working at MCTC. Like Plaintiff Guy, Plaintiff Lovelace

also has individualized claims related to sexual harassment and retaliation.

179.    Plaintiff Lovelace has been subjected to the same harassing environment as other

POC at MCTC, and some examples of harassment and discrimination against him include, but is

not limited to:

a.   On or about February 3, 2023, Plaintiff Lovelace was told by Captain Michael Cunningham ("Cpt. Cunningham") that colored hair of any kind had to be taken out prior to beginning the workday. At this time, Plaintiff Lovelace had a solid ginger color added to her hair. This directive from Cpt. Cunningham was contradictory to the stated policy of DSPCS. Further, other Caucasian female COs color their hair and have not been directed to remove the color in their hair.

b.   On or about February 6, 2023, Plaintiff Lovelace was told by Defendant Rudisil that she, explicitly, was to remove the color from her hair. This directive from Defendant Rudisil was contradictory to the stated policy of DSPCS. Further, other Caucasian female COs color their hair and have not been directed to remove the color in their hair.

c.   On or about February 9, 2023, Plaintiff Lovelace was told by Major Jeffrey Bradshaw ("Maj. Bradshaw") that her hair had to be one color and argued with her about the applicable policy. This directive from Maj. Bradshaw was contradictory to the stated policy of DSPCS. Further, other Caucasian female COs color their hair and have not been directed to remove the color in their hair.

d.   On or about February 17, 2023, Plaintiff was called to the Assistant Warden's ("AW") office to discuss her hair coloring. Plaintiff removed her hair color in compliance with Maj. Bradshaw's verbal, but not written, directive on or about February 12, 2023.

e.   Plaintiff Lovelace has been subjected to unwelcome sexual comments and behavior, as well as comments relating to her ability to be a CO based on her gender.

180.     Furthermore, Plaintiff Lovelace has been retaliated against by DPSCS and the 40 West Defendants whenever she has attempted to complain and/or when she actually submitted a complaint regarding the severe and pervasive pattern or practice of harassment and discrimination. This retaliation includes, but is not limited to:

      a.    After filing her Charge of Discrimination on or about September 8, 2022, in or about October 2022, Plaintiff Lovelace was approached by Officer Bradley Deshong ("Ofc. Deshong") and Officer Scott Blankley ("Ofc. Blankley") in or near HU #5. Ofcs. Deshong and Blankley told Plaintiff Lovelace that she was causing trouble and Plaintiff Lovelace told them that she was not and disengaged from the encounter.

      b.    Later in or about October 2022, Plaintiff Lovelace was outside of an office on the MCTC compound and saw Officer Daniel Coons ("Ofc. Coons"), Officer John Davis ("Ofc. Davis"), and Ofcs. Deshong and Blankley speaking among themselves. Shortly thereafter, the group walked into the office which Plaintiff Lovelace was near. As the group entered the office, someone shouted to Plaintiff Lovelace calling her a "bitch".

      c.    The acts and omissions described in ¶¶ 161(a) – (d).

181.     In addition to the various discrete acts of discrimination and retaliation described herein, Plaintiff Lovelace was subjected to a hostile work environment typified by the daily habitual and routine use of racial epithets and derogatory remarks aimed at herself and other similarly situated individuals by the 40 West Defendants.

## VII.    CIVIL RIGHTS CLASS ACTION ALLEGATIONS

182.     In accordance with Md. Rule 2-231, Plaintiffs bring their claims against all Defendants in violation of 42 U.S.C. §§ 1981, 1983, 1985, as well as Title VII and MFEPA as class claims, on behalf of themselves and other similarly situated individuals, for relief to redress and remedy the common unlawful conspiracy, and overt acts in furtherance of the conspiracy, against the protected civil rights of the Plaintiffs and other similarly situated individuals that was

so prevalent that it constituted a *de facto* general policy, pattern, and/or practice of discrimination

of DPSCS at the MCTC compound ("Civil Rights Class" or "CRC").

183.    Pursuit of this action as a class will provide the most efficient mechanism for

adjudicating the claims of the Plaintiffs and the putative class members.

184.    **Proposed Sub-Classes of the Civil Rights Class:**

   a. ***Promotion Sub-Class:*** All current and former individual black COs and
   immigrant COs at MCTC, who were subject to promotion policies and/or
   denied promotions and/or did not receive the opportunity to apply for
   promotions by DPSCS from three (3) years from the filing of this Complaint
   through the present.;

   b. ***Arms Card Sub-Class:*** All current and former individual black COs and
   immigrant COs at MCTC who were denied an arms card and/or did not receive
   the opportunity to apply for an arms card from three (3) years from the filing of
   this Complaint through the present;

   c. ***Overtime Sub-Class:*** All current and former individual black COs and
   immigrant COs at MCTC who were denied overtime opportunities in the form
   of additional shifts and/or were not selected to take overtime opportunities in
   the form of additional shifts from three (3) years from the filing of this
   Complaint through the present;

   d. ***Discipline Sub-Class:*** All current and former individual black COs and
   immigrant COs at MCTC, who were disciplined in excess of written policies
   and procedures and/or in contravention of written policies and procedures
   (including charges, investigations, suspensions, demotions, and/or
   terminations) from three (3) years from the filing of this Complaint through the
   present;

   e. ***Hostile Work Environment Sub-Class (Discrimination and Retaliation):*** All
   current and former individual black COs and immigrant COs at MCTC.

185.    The proposed class is easily ascertainable. The number and identity of class

members may be determined from DPSCS records which, upon information and belief, are

maintained for a number of years after the record is made. In fact, DPSCS maintains records of all

promotions and disciplinary charges brought, their outcome, and these records include the data

about the COs race and national origin.

40

186. **Md. Rule 2-231 Requirements:**

    a. ***Numerosity:*** The Civil Rights Class is so numerous that joinder of all class members is impracticable and the disposition of these individuals' claims as a class will benefit both the parties and the Court. The Civil Rights Class members may be notified of the pendency of this action by published and/or mailed notice. While the exact number of Civil Rights Class members is unknown to Plaintiffs at this time, upon information and belief, the Civil Rights Class comprises at least 60 persons.

    b. ***Commonality:*** Plaintiffs and members of the proposed class they seek to represent have all been harmed by DPSCS's common *de facto* policy perpetrated in whole or in part by the 40 West Defendants and others in that they have suffered discriminatory wrongs such as retaliation, disparate treatment, and hostile work environment, loss of overtime compensation, loss of promotions, and loss of the ability to receive an arms card. The common questions in this case include, but are not limited to:

        i. Whether DPSCS's policy and/or its discipline practices treated, and continue to treat, POCs differently than Caucasian officers;

        ii. Whether this treatment was and is animated by discriminatory animus;

        iii. Whether the promotions and arms cards were distributed to COs outside of a protected racial and/or national origin class with greater frequency than those within a protected racial and/or national origin class.

    c. ***Typicality:*** Plaintiffs and the members of the proposed class have been subject to the same unlawful policies, practices, and procedures and thus have suffered similar harms. All putative class members have been subject to DPSCS's promotional and/or disciplinary policies and have experienced excessive discipline and other negative employment consequences as a result. Plaintiffs' claims are typical of the claims that could be brought by any member of the class, and the relief sought is typical of the relief that could be sought by any member of the class in a separate action.

    d. ***Adequacy of Representation:*** Plaintiffs are able to fairly and adequately protect the interests of all members of the class, as they are challenging the same policy and practices as the class as a whole, and there are no known conflicts of interest between Plaintiffs and the members of the proposed class. Plaintiffs have retained counsel who are experienced and competent in employment discrimination claims and in complex class-action litigation.

    e. ***Predominance and Superiority:*** The common questions identified above predominate over any individual issues and will lead to the generation of common answers through class wide proof. A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all class members is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their

claims in a single forum simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individual actions involve. Because the losses, injuries, and damages suffered by each individual class member are small in the sense pertinent to class action analysis, the expense and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress wrongs done to them.

187.    Likewise, important public interests will be served by addressing the matter as a class action. Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications, establishing incompatible standards of conduct for DPSCS and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court may fashion methods to efficiently manage this action as a class action. Pursuit of this action on behalf of a class will provide the most efficient mechanism for adjudicating the claims of Plaintiffs and CRC Plaintiffs. Class action resolution of these claims will benefit both the parties and the Court, streamline adjudication of common issues, and promote the fair and efficient resolution of this controversy.

## VIII.   RACKETEERING INFLUENCED

## CORRUPT ORGANIZATION CLASS ACTION ALLEGATIONS

188.    In accordance with Md. Rule 2-231, Plaintiffs bring their claims against the 40 West Defendants in violation of the Racketeering Influenced Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c) and (d) as class claims, on behalf of themselves and other similarly situated individuals, for relief to redress and remedy the common unlawful conspiracy, and overt acts in furtherance of the conspiracy, to defraud Plaintiffs and other similarly situated individuals so that the 40 West Defendants could acquire overtime wages from Plaintiffs and other similarly situated individuals and retaliate against Plaintiffs and similarly situated other individuals who took part in

42

protected activities related to or opposing: (1) the discriminatory conduct of the 40 West Defendants or; (2) the smuggling of contraband into MCTC by or for the 40 West Defendants ("RICO Class").

189.     Pursuit of this action as a class will provide the most efficient mechanism for adjudicating the claims of the Plaintiffs and the putative class members.

190.     **Proposed RICO Class:** All current and former individual COs who qualified for overtime opportunities in the form of additional shifts from four (4) years from the filing of this Complaint through the present.

191.     The proposed class is easily ascertainable. The number and identity of class members may be determined from DPSCS records which, upon information and belief, are maintained for a number of years after the record is made. In fact, DPSCS maintains records of all promotions, shift schedules, and disciplinary charges brought and their outcome.

192.     **Md. Rule 2-231 Requirements:**

   a. ***Numerosity:*** The RICO Class is so numerous that joinder of all class members is impracticable and the disposition of these individuals' claims as a class will benefit both the parties and the Court. The RICO Class members may be notified of the pendency of this action by published and/or mailed notice. While the exact number of RICO Class members is unknown to Plaintiffs at this time, upon information and belief, the RICO Class comprises at least 60 persons.

   b. ***Commonality:*** Plaintiffs and members of the proposed class they seek to represent have all been harmed by the 40 West Defendants in that they have been fraudulently denied opportunities for overtime shifts and compensation. The common questions for this RICO Class and its subclasses include, but are not limited to:

      i. Whether the 40 West Defendants used their control over the operation and management of MCTC to deviate from the "seniority list" in awarding overtime shifts to Plaintiffs and RICO Class Plaintiffs;
      ii. Whether the 40 West Defendants intended to defraud Plaintiffs and RICO Class Plaintiffs who relied on the use of a "seniority list" to ensure equitable distribution of overtime shifts;

43

iii. Whether the intent to defraud Plaintiffs and RICO Class Plaintiffs was motivated in whole or in part by discriminatory and/or retaliatory animus;

iv. Whether the 40 West Defendants awarded overtime shifts to members of "40 West" and/or other supporting individuals to acquire overtime wages at the expense of Plaintiffs and RICO Class Plaintiffs.

c. *Typicality:* Plaintiffs and the members of the proposed class have been subject to the same fraudulent and/or retaliatory scheme and thus have suffered similar harms. All putative class members have been subject to the same fraudulent and/or retaliatory scheme. Plaintiffs' claims are typical of the claims that could be brought by any member of the class, and the relief sought is typical of the relief that could be sought by any member of the class in a separate action.

d. *Adequacy of Representation:* Plaintiffs are able to fairly and adequately protect the interests of all members of the class, as they are challenging the same policy and practices as the class as a whole, and there are no known conflicts of interest between Plaintiffs and the members of the proposed class. Plaintiffs have retained counsel who are experienced and competent in complex class-action litigation.

e. *Predominance and Superiority:* The common questions identified above predominate over any individual issues and will lead to the generation of common answers through class wide proof. A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all class members is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their claims in a single forum simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individual actions involve. Because the losses, injuries, and damages suffered by each individual class member are small in the sense pertinent to class action analysis, the expense and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress wrongs done to them.

193. Likewise, important public interests will be served by addressing the matter as a class action. Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications, establishing incompatible standards of conduct for DPSCS and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court may fashion methods to efficiently manage this action as a class action. Pursuit of this action on behalf of a

44

class will provide the most efficient mechanism for adjudicating the claims of Plaintiffs and RICO

Class Plaintiffs. Class action resolution of these claims will benefit both the parties and the Court,

streamline adjudication of common issues, and promote the fair and efficient resolution of this

controversy.

**COUNT I:**
**Discrimination and Retaliation**
**in Violation of the 1866 Civil Rights Act,**
**42 U.S.C. § 1983 ("Section 1983") on behalf of all Plaintiffs and CRC Plaintiffs**
**(Defendant DPSCS)**

194.    Plaintiffs re-allege and incorporate by reference each and every allegation

contained in the previous paragraphs of this Complaint as though fully set forth herein.

195.    By the aforementioned acts and/or omissions, among others, Defendant DPSCS

and offices, acting under the color of law, discriminated against Plaintiffs and Civil Rights Class

Plaintiffs on the basis of their race and/or national origin in violation of the 1866 Civil Rights Act,

42 U.S.C. § 1983 ("Section 1983").

196.    The First Amendment to the United States Constitution guarantees the freedom of

speech, assembly, and other enumerated rights and privileges to citizens, with violations thereof

giving rise to claims for relief under Section 1983.

197.    The Fourteenth Amendment to the United States Constitution guarantees citizens

equal protection of the laws of the United States, with violations thereof giving rise to claims for

relief under Section 1983.

198.    42 U.S.C. § 1981 guarantees equal rights in every State and Territory to non-

Caucasian citizens to make and enforce contracts, to sue, be parties, give evidence, and to the full

and equal benefit of all laws and proceedings for the security of persons and property, with

violations thereof giving rise to claims for relief under Section 1983.

45

199.    Section 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the United States Constitution and laws" by persons acting under the color of law. The right to be free from racial discrimination in employment and retaliation for assertion of one's civil rights were both clear and well-established rights, known and/or reasonably should have been known to Defendant DPSCS, throughout the time period of the allegations of this **Complaint.**

200.    By the acts and omissions described above, Defendant DPSCS, while acting under color of state law, has knowingly engaged in and/or reasonably should have known it was engaging in a longstanding pattern or practice of discriminating against POC by, *inter alia*: (1) maintaining, allowing, and failing to stop, correct, prevent, and/or eliminate a hostile work environment which has altered the terms and conditions of employment for POC; (2) treating said officers to different investigatory and disciplinary processes than other COs outside of the Plaintiffs and Civil Rights Class Plaintiffs protected class; (3) imposing unwarranted disciplinary penalties; (4) continuing to refuse and/or fail to fully and/or adequately stop, correct, and/or discipline Caucasian officers, including the 40 West Defendants, who have engaged in systemic acts of discrimination; (5) maintaining, allowing, and failing to stop, correct, prevent and/or eliminate a systemic pattern or practice of denying POC preferable assignments, locations, training opportunities, and overtime opportunities which they were qualified for and which similarly situated Caucasian COs were routinely granted; and (6) other discriminatory acts and practices.

201.    Notwithstanding this egregious pattern or practice of discrimination, Defendant DPSCS, while acting under color of state law, has maintained and continues to maintain an employment policy and continuing practice of willful and intentional retaliation against employees, including, Plaintiffs and Civil Rights Class Plaintiffs, who raise objections to the

DPSCS's racially discriminatory employment and policing practices, thereby depriving Plaintiffs and Civil Rights Class Plaintiffs of their rights to petition the government for redress of grievances, as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

202.    Plaintiffs and the Civil Rights Class Plaintiffs have been systematically retaliated against whenever they have attempted to raise concerns, formally or informally, including relating to, but not only relating to: (1) the discriminatory treatment they have been subjected to (including racism in hiring, promotions, discipline, assignments, disparate treatment, and racist symbols); (2) complaints to DPSCS's Office of Fair Practice; (3) complaints made during the course of the disciplinary process and Trial Board; (4) complaints to the EEOC and/or Maryland state and/or local Fair Employment Practice Agencies (FEPAs); (5) complaints to elected officials; (6) comments to the media about racism at DPSCS; and (7) other discriminatory acts and practices.

203.    Such retaliatory acts and omissions include, *inter alia*: (1) the regular instigation of unfounded and pretextual disciplinary charges; (2) harassment about participation in a protected activity; (3) threats for participation in a protected activity; (4) disqualification from eligibility for and/or refusal to grant a promotion; (5) disqualification from and/or refusal to give overtime opportunities; (6) other retaliatory acts and practices.

204.    Defendant DPSCS has, by the actions described herein, acted under the color of state law to discriminate and retaliate against Plaintiffs and the Civil Rights Class Plaintiffs on the basis of race, and/or national origin, thereby depriving them of rights, privileges, and immunities secured to them by the Constitution and laws of the United States, and in direct violation of the First and Fourteenth Amendments to the United States Constitution.

205.    The acts and omissions of Defendant DPSCS, in depriving Plaintiffs and the Civil Rights Class Plaintiffs of their constitutional and civil rights, were willful and malicious and

constitute a continuing violation of the First Amendment, Fourteenth Amendment, and the laws of the United States.

206.    As a direct and proximate result of these acts, Plaintiffs and the Civil Rights Class Plaintiffs have been and continue to be deprived of their civil rights, suffered and continue to suffer loss of employment, loss of income, race and/or national origin-based discrimination in job advancement, loss of other employment benefits, and have suffered and continue to suffer emotional and mental distress, humiliation, medical expenses, embarrassment, and damage to their reputations.

207.    As a direct and proximate result of Defendant DPSCS's unlawful, discriminatory, and retaliatory conduct in violation of Section 1983, Plaintiffs and the Civil Rights Class Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages and other relief to make them whole to the greatest extent permitted under the law.

208.    In addition, as the discrimination outlined in this Complaint is ongoing and continuous, Plaintiffs and the Civil Rights Class Plaintiffs are entitled to injunctive relief.

WHEREFORE, Plaintiffs Alpheaus Bangura, Akinlolu Britto, Colenzo Grant, Maranda Guy, and Macardy Lovelace as well as the Civil Rights Class demand judgment against Defendant Department of Public Safety and Correctional Services in an amount in excess of $75,000.00, for damages incurred as a result of the claims maintained herein, notably, past, present, and continuing medical bills, lost wages, impaired earnings capacity, pain and suffering, mental anguish, emotional distress, costs, pre- and post-judgment interest, if applicable, attorneys' fees and the costs of pursuing this action, equitable relief, injunctive relief, and declaratory relief.

**COUNT II:**
**Discrimination and Retaliation**
**in Violation of the 1866 Civil Rights Act,**
**42 U.S.C. § 1983 ("Section 1983") on behalf of all Plaintiffs and CRC Plaintiffs**
**(40 West Defendants)**

209.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

210.    By the aforementioned acts and/or omissions, among others, the 40 West Defendants discriminated against Plaintiffs and Civil Rights Class Plaintiffs on the basis of their race, and/or national origin in violation of the 1866 Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983").

211.    The First Amendment to the United States Constitution guarantees the freedom of speech, assembly, and other enumerated rights and privileges to citizens, with violations thereof giving rise to claims for relief under Section 1983.

212.    The Fourteenth Amendment to the United States Constitution guarantees citizens equal protection of the laws of the United States, with violations thereof giving rise to claims for relief under Section 1983.

213.    42 U.S.C. § 1981 guarantees equal rights in every State and Territory to non-Caucasian citizens to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, with violations thereof giving rise to claims for relief under Section 1983.

214.    Section 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the United States Constitution and laws" by persons acting under the color of law. The right to be free from racial discrimination in employment and retaliation for assertion of one's civil rights were both clear and well-established rights, known and/or reasonably should

have been known to the 40 West Defendants, throughout the time period of the allegations of this Complaint.

215.    By the acts and omissions described above, the 40 West Defendants, while acting under color of state law, has knowingly engaged in and/or reasonably should have known it was engaging in a longstanding pattern or practice of discriminating against POC by, *inter alia*: (1) perpetuating, maintaining, allowing, and failing to stop, correct, prevent, and/or eliminate a hostile work environment which has altered the terms and conditions of employment for POC; (2) treating said officers to different investigatory and disciplinary processes than other COs outside of the Plaintiffs and Civil Rights Class Plaintiffs protected class; (3) imposing unwarranted disciplinary penalties; (4) improperly denying promotions; (5) improperly and/or fraudulently denying overtime opportunities; (6) improperly denying "arms cards" to POC; (7) perpetuating, maintaining, allowing, and failing to stop, correct, prevent and/or eliminate a systemic pattern or practice of denying POC preferable assignments, locations, training opportunities, and overtime opportunities which they were qualified for and which similarly situated Caucasian COs were routinely granted; and (8) other discriminatory acts and practices.

216.    Notwithstanding this egregious pattern or practice of discrimination, the 40 West Defendants, while acting under color of state law in their individual and official capacities, have perpetuated and maintained and/or continue to perpetuate and maintain an employment policy and continuing practice of willful and intentional retaliation against employees, including, Plaintiffs and Civil Rights Class Plaintiffs, who raise objections to the DPSCS's racially discriminatory employment and policing practices, thereby depriving Plaintiffs and Civil Rights Class Plaintiffs of their rights to petition the government for redress of grievances, as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

217.    Plaintiffs and the Civil Rights Class Plaintiffs have been systematically retaliated against whenever they have attempted to raise concerns, formally or informally, including relating to, but not only relating to: (1) the discriminatory treatment they have been subjected to (including racism in hiring, promotions, discipline, assignments, disparate treatment, and racist symbols); (2) complaints to DPSCS's Office of Fair Practice; (3) complaints made during the course of the disciplinary process and Trial Board; (4) complaints to the EEOC and/or Maryland state and/or local Fair Employment Practice Agencies ("FEPAs"); (5) complaints to elected officials; (6) comments to the media about racism at DPSCS; and (7) other discriminatory acts and practices.

218.    Such retaliatory acts and omissions include, *inter alia*: (1) the regular instigation of unfounded and pretextual disciplinary charges; (2) harassment about participation in a protected activity; (3) threats for participation in a protected activity; (4) disqualification from eligibility for and/or refusal to grant a promotion; (5) disqualification from and/or refusal to give overtime opportunities; (5) other retaliatory acts and practices.

219.    The 40 West Defendants have, by the actions described herein, acted under the color of state law to discriminate and retaliate against Plaintiffs and the Civil Rights Class Plaintiffs on the basis of race and/or national origin, thereby depriving them of rights, privileges, and immunities secured to them by the Constitution and laws of the United States, and in direct violation of the First and Fourteenth Amendments to the United States Constitution.

220.    The acts and omissions of the 40 West Defendants, in depriving Plaintiffs and the Civil Rights Class Plaintiffs of their constitutional and civil rights, were willful and malicious and constitute a continuing violation of the First Amendment, Fourteenth Amendment, and the laws of the United States.

221.    The acts and omissions of the 40 West Defendants violated clearly established statutory and constitutional rights of which any reasonable person would have known existed at the time the acts and omissions were committed.

222.    As a direct and proximate result of these acts, Plaintiffs and the Civil Rights Class Plaintiffs have been and continue to be deprived of their civil rights, suffered and continue to suffer loss of employment, loss of income, race, and/or national origin-based discrimination in job advancement, loss of other employment benefits, and have suffered and continue to suffer emotional and mental distress, humiliation, medical expenses, embarrassment, and damage to their reputations.

223.    As a direct and proximate result of the 40 West Defendants' unlawful, discriminatory, and retaliatory conduct in violation of Section 1983, Plaintiffs and the Civil Rights Class Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages and other relief to make them whole to the greatest extent permitted under the law.

224.    In addition, as the discrimination outlined in this Complaint is ongoing and continuous, Plaintiffs and the Civil Rights Class Plaintiffs are entitled to injunctive relief.

WHEREFORE, Plaintiffs Alpheaus Bangura, Akinlolu Britto, Colenzo Grant, Maranda Guy, and Macardy Lovelace as well as the Civil Rights Class demand judgment, jointly and severally, against the 40 West Defendants in an amount in excess of $75,000.00, for damages incurred as a result of the claims maintained herein, notably, past, present, and continuing medical bills, lost wages, impaired earnings capacity, pain and suffering, mental anguish, emotional distress, costs, pre- and post-judgment interest, if applicable, attorneys' fees and the costs of pursuing this action, equitable relief, injunctive relief, and declaratory relief.

**COUNT III:**
**Discrimination and Retaliation**
**in Violation of Title VII of the Civil Rights Act of 1964,**
**as amended, 42 U.S.C. § 2000e et seq., on behalf of Plaintiffs and the CRC Plaintiffs**
**(Defendant DPSCS)**

225.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

226.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, prohibits employers from discriminating against individuals on the basis of race, national origin, and other protected characteristics in terms, conditions, and privileges of employment.

227.    Defendant DPSCS is an employer within the meaning of Title VII.

228.    By the acts and omissions described above, Defendant DPSCS has engaged in a pattern and practice of discrimination against Plaintiffs and the Class on the basis of race, and/or national origin, in violation of Title VII, by *inter alia*: (1) maintaining, allowing, and failing to stop, correct, prevent, and/or eliminate a hostile work environment which has altered the terms and conditions of employment for POC; (2) treating said officers to different investigatory and disciplinary processes than other COs outside of the Plaintiffs and Civil Rights Class Plaintiffs protected class; (3) imposing unwarranted disciplinary penalties; (4) continuing to refuse and/or fail to fully and/or adequately stop, correct, and/or discipline Caucasian officers, including the 40 West Defendants, who have engaged in systemic acts of discrimination; (5) maintaining, allowing, and failing to stop, correct, prevent and/or eliminate a systemic pattern or practice of denying POC preferable assignments, locations, training opportunities, and overtime opportunities which they were qualified for and which similarly situated Caucasian COs were routinely granted; and (6) other discriminatory acts and practices.

229.    Notwithstanding this egregious pattern or practice of discrimination, Defendant DPSCS has maintained and continues to maintain an employment policy and continuing practice

53

of willful and intentional retaliation against employees, including Plaintiffs and Civil Rights Class Plaintiffs, who raise objections to the DPSCS's racially discriminatory employment and policing practices.

230. Plaintiffs and the Civil Rights Class Plaintiffs have been systematically retaliated against whenever they have attempted to raise concerns, formally or informally, including relating to, but not only relating to: (1) the discriminatory treatment they have been subjected to (including racism in hiring, promotions, discipline, assignments, disparate treatment, and racist symbols); (2) complaints to DPSCS's Office of Fair Practice; (3) complaints made during the course of the disciplinary process and Trial Board; (4) complaints to the EEOC and/or Maryland state and/or local Fair Employment Practice Agencies (FEPAs); (5) complaints to elected officials; (6) comments to the media about racism at DPSCS; and (7) other discriminatory acts and practices.

231. Such retaliatory acts and omissions include, *inter alia*: (1) the regular instigation of unfounded and pretextual disciplinary charges; (2) harassment about participation in a protected activity; (3) threats for participation in a protected activity; (4) disqualification from eligibility for and/or refusal to grant a promotion; (5) disqualification from and/or refusal to give overtime opportunities; (6) other retaliatory acts and practices.

232. As a direct and proximate result of these acts, Plaintiffs and the Civil Rights Class Plaintiffs have been and continue to be deprived of their civil rights, suffered and continue to suffer loss of employment, loss of income, race, and/or national origin-based discrimination in job advancement, loss of other employment benefits, and have suffered and continue to suffer emotional and mental distress, humiliation, medical expenses, embarrassment, and damage to their reputations.

233.    As a direct and proximate result of Defendant DPSCS's unlawful, discriminatory, and retaliatory conduct in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, Plaintiffs and the Civil Rights Class Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages and other relief to make them whole to the greatest extent permitted under the law.

234.    Plaintiffs Guy and Lovelace also bring claims for sexual harassment and sex discrimination under Title VII.

WHEREFORE, Plaintiffs Alpheaus Bangura, Akinlolu Britto, Colenzo Grant, Maranda Guy, and Macardy Lovelace as well as the Civil Rights Class demand judgment against Defendant Department of Public Safety and Correctional Services in an amount in excess of $75,000.00, for damages incurred as a result of the claims maintained herein, notably, past, present, and continuing medical bills, lost wages, impaired earnings capacity, pain and suffering, mental anguish, emotional distress, costs, pre- and post-judgment interest, if applicable, attorneys' fees and the costs of pursuing this action, equitable relief, injunctive relief, and declaratory relief.

**COUNT IV:**
**Discrimination and Retaliation**
**in Violation of MFEPA, Md. Code Ann.,**
**State Gov't § 20-601 *et seq.*, on behalf of Plaintiffs and CRC Plaintiffs**
**(Defendant DPSCS)**

235.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

236.    The Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-601 *et seq.*, prohibits employers from discriminating against individuals on the basis of race, color, national origin, and other protected characteristics in terms, conditions, and privileges of employment.

237.    Defendant DPSCS is an employer within the meaning of MFEPA.

238.    By the acts and omissions described above, Defendant DPSCS has engaged in a pattern and practice of discrimination against Plaintiffs and the Class on the basis of race, and/or national origin, in violation of MFEPA, by *inter alia*: (1) maintaining, allowing, and failing to stop, correct, prevent, and/or eliminate a hostile work environment which has altered the terms and conditions of employment for POC; (2) treating said officers to different investigatory and disciplinary processes than other COs outside of the Plaintiffs and Civil Rights Class Plaintiffs protected class; (3) imposing unwarranted disciplinary penalties; (4) continuing to refuse and/or fail to fully and/or adequately stop, correct, and/or discipline Caucasian officers, including the 40 West Defendants, who have engaged in systemic acts of discrimination; (5) maintaining, allowing, and failing to stop, correct, prevent and/or eliminate a systemic pattern or practice of denying POC preferable assignments, locations, training opportunities, and overtime opportunities which they were qualified for and which similarly situated Caucasian COs were routinely granted; and (6) other discriminatory acts and practices.

239.    Notwithstanding this egregious pattern or practice of discrimination, Defendant DPSCS has maintained and continues to maintain an employment policy and continuing practice of willful and intentional retaliation against employees, including Plaintiffs and Civil Rights Class Plaintiffs, who raise objections to the DPSCS's racially discriminatory employment and policing practices.

240.    Plaintiffs and the Civil Rights Class Plaintiffs have been systematically retaliated against whenever they have attempted to raise concerns, formally or informally, including relating to, but not only relating to: (1) the discriminatory treatment they have been subjected to (including racism in hiring, promotions, discipline, assignments, disparate treatment, and racist symbols); (2) complaints to DPSCS's Office of Fair Practice; (3) complaints made during the course of the

disciplinary process and Trial Board; (4) complaints to the EEOC and/or Maryland state and/or local Fair Employment Practice Agencies (FEPAs); (5) complaints to elected officials; (6) comments to the media about racism at DPSCS; and (7) other discriminatory acts and practices.

241.    Such retaliatory acts and omissions include, *inter alia*: (1) the regular instigation of unfounded and pretextual disciplinary charges; (2) harassment about participation in a protected activity; (3) threats for participation in a protected activity; (4) disqualification from eligibility for and/or refusal to grant a promotion; (5) disqualification from and/or refusal to give overtime opportunities; (6) other retaliatory acts and practices.

242.    As a direct and proximate result of these acts, Plaintiffs and the Civil Rights Class Plaintiffs have been and continue to be deprived of their civil rights, suffered and continue to suffer loss of employment, loss of income, race, and/or national origin-based discrimination in job advancement, loss of other employment benefits, and have suffered and continue to suffer emotional and mental distress, humiliation, medical expenses, embarrassment, and damage to their reputations.

243.    As a direct and proximate result of Defendant DPSCS's unlawful, discriminatory, and retaliatory conduct in violation of MFEPA, Md. Code Ann., State Gov't § 20-601 *et seq.*, Plaintiffs and the Civil Rights Class Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages and other relief to make them whole to the greatest extent permitted under the law.

244.    Plaintiffs Guy and Lovelace also bring claims for sexual harassment and sex discrimination under MFEPA.

WHEREFORE, Plaintiffs Alpheaus Bangura, Akinlolu Britto, Colenzo Grant, Maranda Guy, and Macardy Lovelace as well as the Civil Rights Class demand judgment against Defendant

Department of Public Safety and Correctional Services in an amount in excess of $75,000.00, for damages incurred as a result of the claims maintained herein, notably, past, present, and continuing medical bills, lost wages, impaired earnings capacity, pain and suffering, mental anguish, emotional distress, costs, pre- and post-judgment interest, if applicable, attorneys' fees and the costs of pursuing this action, equitable relief, injunctive relief, and declaratory relief.

**COUNT V:**
**Discrimination and Retaliation in Violation**
**of Article 24 of the Maryland Declaration of Rights**
**(Defendant DPSCS)**

245.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

246.    By the aforementioned acts and/or omissions, among others, Defendant DPSCS and offices, acting under the color of law, discriminated against Plaintiffs and Civil Rights Class Plaintiffs on the basis of their race and/or national origin in violation of Article 24 of the Maryland Declaration of Rights.

247.    Article 24 of the Maryland Declaration of Rights is applied in like manner and to the same extent as the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

248.    By the acts and omissions described above, Defendant DPSCS, while acting under color of state law, has knowingly engaged in and/or reasonably should have known it was engaging in a longstanding pattern or practice of discriminating against POC by, *inter alia*: (1) maintaining, allowing, and failing to stop, correct, prevent, and/or eliminate a hostile work environment which has altered the terms and conditions of employment for POC; (2) treating said officers to different investigatory and disciplinary processes than other COs outside of the Plaintiffs and Civil Rights Class Plaintiffs protected class; (3) imposing unwarranted disciplinary penalties; (4) continuing to

refuse and/or fail to fully and/or adequately stop, correct, and/or discipline Caucasian officers, including the 40 West Defendants, who have engaged in systemic acts of discrimination; (5) maintaining, allowing, and failing to stop, correct, prevent and/or eliminate a systemic pattern or practice of denying POC preferable assignments, locations, training opportunities, and overtime opportunities which they were qualified for and which similarly situated Caucasian COs were routinely granted; and (6) other discriminatory acts and practices.

249.    Notwithstanding this egregious pattern or practice of discrimination, Defendant DPSCS, while acting under color of state law, has maintained and continues to maintain an employment policy and continuing practice of willful and intentional retaliation against employees, including, Plaintiffs and Civil Rights Class Plaintiffs, who raise objections to the DPSCS's racially discriminatory employment and policing practices, thereby depriving Plaintiffs and Civil Rights Class Plaintiffs of their rights to petition the government for redress of grievances, as guaranteed by Article 24 of the Maryland Declaration of Rights.

250.    Plaintiffs and the Civil Rights Class Plaintiffs have been systematically retaliated against whenever they have attempted to raise concerns, formally or informally, including relating to, but not only relating to: (1) the discriminatory treatment they have been subjected to (including racism in hiring, promotions, discipline, assignments, disparate treatment, and racist symbols); (2) complaints to DPSCS's Office of Fair Practice; (3) complaints made during the course of the disciplinary process and Trial Board; (4) complaints to the EEOC and/or Maryland state and/or local Fair Employment Practice Agencies (FEPAs); (5) complaints to elected officials; (6) comments to the media about racism at DPSCS; and (7) other discriminatory acts and practices.

251.    Such retaliatory acts and omissions include, *inter alia*: (1) the regular instigation of unfounded and pretextual disciplinary charges; (2) harassment about participation in a protected

activity; (3) threats for participation in a protected activity; (4) disqualification from eligibility for and/or refusal to grant a promotion; (5) disqualification from and/or refusal to give overtime opportunities; (6) other retaliatory acts and practices.

252.    Defendant DPSCS has, by the actions described herein, acted under the color of state law to discriminate and retaliate against Plaintiffs and the Civil Rights Class Plaintiffs on the basis of race, and/or national origin, thereby depriving them of rights, privileges, and immunities secured to them by Article 24 of the Maryland Declaration of Rights.

253.    The acts and omissions of Defendant DPSCS, in depriving Plaintiffs and the Civil Rights Class Plaintiffs of their constitutional and civil rights, were willful and malicious and constitute a continuing violation of Article 24 of the Maryland Declaration of Rights.

254.    As a direct and proximate result of these acts, Plaintiffs and the Civil Rights Class Plaintiffs have been and continue to be deprived of their civil rights, suffered and continue to suffer loss of employment, loss of income, race and/or national origin-based discrimination in job advancement, loss of other employment benefits, and have suffered and continue to suffer emotional and mental distress, humiliation, medical expenses, embarrassment, and damage to their reputations.

255.    As a direct and proximate result of Defendant DPSCS's unlawful, discriminatory, and retaliatory conduct in violation of Article 24 of the Maryland Declaration of Rights, Plaintiffs and the Civil Rights Class Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages and other relief to make them whole to the greatest extent permitted under the law.

256.    In addition, as the discrimination outlined in this Complaint is ongoing and continuous, Plaintiffs and the Civil Rights Class Plaintiffs are entitled to injunctive relief.

WHEREFORE, Plaintiffs Alpheaus Bangura, Akinlolu Britto, Colenzo Grant, Maranda Guy, and Macardy Lovelace as well as the Civil Rights Class demand judgment against Defendant Department of Public Safety and Correctional Services in an amount in excess of $75,000.00, for damages incurred as a result of the claims maintained herein, notably, past, present, and continuing medical bills, lost wages, impaired earnings capacity, pain and suffering, mental anguish, emotional distress, costs, pre- and post-judgment interest, if applicable, attorneys' fees and the costs of pursuing this action, equitable relief, injunctive relief, and declaratory relief.

## COUNT VI:
### Discrimination and Retaliation in Violation
### of Article 24 of the Maryland Declaration of Rights
### (40 West Defendants)

257. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

258. By the aforementioned acts and/or omissions, among others, the 40 West Defendants discriminated against Plaintiffs and Civil Rights Class Plaintiffs on the basis of their race, and/or national origin in violation of Article 24 of the Maryland Declaration of Rights.

259. Article 24 of the Maryland Declaration of Rights is applied in like manner and to the same extent as the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

260. By the acts and omissions described above, the 40 West Defendants, while acting under color of state law, has knowingly engaged in and/or reasonably should have known it was engaging in a longstanding pattern or practice of discriminating against POC by, *inter alia*: (1) perpetuating, maintaining, allowing, and failing to stop, correct, prevent, and/or eliminate a hostile work environment which has altered the terms and conditions of employment for POC; (2) treating said officers to different investigatory and disciplinary processes than other COs outside of the

61

Plaintiffs and Civil Rights Class Plaintiffs protected class; (3) imposing unwarranted disciplinary penalties; (4) improperly denying promotions; (5) improperly and/or fraudulently denying overtime opportunities; (6) improperly denying "arms cards" to POC; (7) perpetuating, maintaining, allowing, and failing to stop, correct, prevent and/or eliminate a systemic pattern or practice of denying POC preferable assignments, locations, training opportunities, and overtime opportunities which they were qualified for and which similarly situated Caucasian COs were routinely granted; and (8) other discriminatory acts and practices.

261.    Notwithstanding this egregious pattern or practice of discrimination, the 40 West Defendants, while acting under color of state law in their individual and official capacities, have perpetuated and maintained and/or continue to perpetuate and maintain an employment policy and continuing practice of willful and intentional retaliation against employees, including, Plaintiffs and Civil Rights Class Plaintiffs, who raise objections to the DPSCS's racially discriminatory employment and policing practices, thereby depriving Plaintiffs and Civil Rights Class Plaintiffs of their rights to petition the government for redress of grievances, as guaranteed Article 24 of the Maryland Declaration of Rights.

262.    Plaintiffs and the Civil Rights Class Plaintiffs have been systematically retaliated against whenever they have attempted to raise concerns, formally or informally, including relating to, but not only relating to: (1) the discriminatory treatment they have been subjected to (including racism in hiring, promotions, discipline, assignments, disparate treatment, and racist symbols); (2) complaints to DPSCS's Office of Fair Practice; (3) complaints made during the course of the disciplinary process and Trial Board; (4) complaints to the EEOC and/or Maryland state and/or local Fair Employment Practice Agencies ("FEPAs"); (5) complaints to elected officials; (6) comments to the media about racism at DPSCS; and (7) other discriminatory acts and practices.

263.    Such retaliatory acts and omissions include, *inter alia*: (1) the regular instigation of unfounded and pretextual disciplinary charges; (2) harassment about participation in a protected activity; (3) threats for participation in a protected activity; (4) disqualification from eligibility for and/or refusal to grant a promotion; (5) disqualification from and/or refusal to give overtime opportunities; (5) other retaliatory acts and practices.

264.    The 40 West Defendants have, by the actions described herein, acted under the color of state law to discriminate and retaliate against Plaintiffs and the Civil Rights Class Plaintiffs on the basis of race and/or national origin, thereby depriving them of equal protection of rights, privileges, and immunities secured to them by Article 24 of the Maryland Declaration of Rights.

265.    The acts and omissions of the 40 West Defendants, in depriving Plaintiffs and the Civil Rights Class Plaintiffs of their constitutional and civil rights, were willful and malicious and constitute a continuing violation of Article 24 of the Maryland Declaration of Rights.

266.    The acts and omissions of the 40 West Defendants violated clearly established statutory and constitutional rights of which any reasonable person would have known existed at the time the acts and omissions were committed.

267.    As a direct and proximate result of these acts, Plaintiffs and the Civil Rights Class Plaintiffs have been and continue to be deprived of their civil rights, suffered and continue to suffer loss of employment, loss of income, race, and/or national origin-based discrimination in job advancement, loss of other employment benefits, and have suffered and continue to suffer emotional and mental distress, humiliation, medical expenses, embarrassment, and damage to their reputations.

268.    As a direct and proximate result of the 40 West Defendants' unlawful, discriminatory, and retaliatory conduct in violation of Article 24 of the Maryland Declaration of

Rights, Plaintiffs and the Civil Rights Class Plaintiffs have suffered and continue to suffer harm

for which they are entitled to an award of damages and other relief to make them whole to the

greatest extent permitted under the law.

269.    In addition, as the discrimination outlined in this Complaint is ongoing and

continuous, Plaintiffs and the Civil Rights Class Plaintiffs are entitled to injunctive relief.

WHEREFORE, Plaintiffs Alpheaus Bangura, Akinlolu Britto, Colenzo Grant, Maranda

Guy, and Macardy Lovelace as well as the Civil Rights Class demand judgment, jointly and

severally, against the 40 West Defendants in an amount in excess of $75,000.00, for damages

incurred as a result of the claims maintained herein, notably, past, present, and continuing medical

bills, lost wages, impaired earnings capacity, pain and suffering, mental anguish, emotional

distress, costs, pre- and post-judgment interest, if applicable, attorneys' fees and the costs of

pursuing this action, equitable relief, injunctive relief, and declaratory relief.

## COUNT VII:
### Conspiracy to Interfere with Civil Rights
### in Violation of 42 U.S.C. § 1985(3), on behalf of Plaintiffs and CRC Plaintiffs
### (40 West Defendants)

270.    Plaintiffs re-allege and incorporate by reference each and every allegation

contained in the previous paragraphs of this Complaint as though fully set forth herein.

271.    The aforementioned acts and/or omissions, among others, committed by the 40

West Defendants evidence a conspiracy by and among the 40 West Defendants to deprive

Plaintiffs and Civil Rights Class Plaintiffs of their equal protection under the law guaranteed to

them by the Constitution of the United States.

272.    Upon information and belief, the conspiracy by and among the 40 West Defendants

has been an ongoing intentional plan, scheme, and/or agreement which began in or about at least

2018.

273.   The purpose of the conspiracy by and among the 40 West Defendants was and is to deprive Plaintiffs and Civil Rights Class Plaintiffs with promotions, "arms cards", overtime opportunities, preferred locations for work duties, and other material employment benefits because of and/or motivated in part by Plaintiffs' and Civil Rights Class Plaintiffs' protected racial and/or national origin class status.

274.   The 40 West Defendants, under the color of state law, acted overtly in furtherance of this conspiracy by, *inter alia*: (1) perpetuating, maintaining, allowing, and failing to stop, correct, prevent, and/or eliminate a hostile work environment which has altered the terms and conditions of employment for POC; (2) treating said officers to different investigatory and disciplinary processes than other COs outside of the Plaintiffs and Civil Rights Class Plaintiffs protected class; (3) imposing unwarranted disciplinary penalties; (4) improperly denying promotions; (5) improperly and/or fraudulently denying overtime opportunities; (6) improperly denying "arms cards" to POC; (7) perpetuating, maintaining, allowing, and failing to stop, correct, prevent and/or eliminate a systemic pattern or practice of denying POC preferable assignments, locations, training opportunities, and overtime opportunities which they were qualified for and which similarly situated Caucasian COs were routinely granted; and (8) other acts and practices.

275.   Further, the 40 West Defendants, under the color of state law in their individual and official capacities, acted in concert to preserve their unlawful conspiracy when Plaintiffs and Civil Rights Class Plaintiffs began complaining about the discriminatory treatment they were subjected to, including, *inter alia*: (1) the regular instigation of unfounded and pretextual disciplinary charges; (2) harassment about participation in a protected activity; (3) threats for participation in a protected activity; (4) disqualification from eligibility for and/or refusal to grant a promotion; (5)

disqualification from and/or refusal to give overtime opportunities; (5) other retaliatory acts and practices.

276.   The acts and omissions of the 40 West Defendants violated clearly established statutory and constitutional rights of which any reasonable person would have known existed at the time the acts and omissions were committed.

277.   As a direct and proximate result of these acts, Plaintiffs and the Civil Rights Class Plaintiffs have been and continue to be deprived of their civil rights, suffered and continue to suffer loss of employment, loss of income, race, and/or national origin-based discrimination in job advancement, loss of other employment benefits, and have suffered and continue to suffer emotional and mental distress, humiliation, medical expenses, embarrassment, and damage to their reputations.

278.   As a direct and proximate result of Defendant DPSCS's unlawful, discriminatory, and retaliatory conduct in violation of Title VII, the United States Constitution, and MFEPA, Md. Code Ann., State Gov't § 20-601 *et seq.*, Plaintiffs and the Civil Rights Class Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages and other relief to make them whole to the greatest extent permitted under the law.

WHEREFORE, Plaintiffs Alpheaus Bangura, Akinlolu Britto, Colenzo Grant, Maranda Guy, and Macardy Lovelace as well as the Civil Rights Class demand judgment, jointly and severally, against the 40 West Defendants in an amount in excess of $75,000.00, for damages incurred as a result of the claims maintained herein, notably, past, present, and continuing medical bills, lost wages, impaired earnings capacity, pain and suffering, mental anguish, emotional distress, costs, pre- and post-judgment interest, if applicable, attorneys' fees and the costs of pursuing this action, equitable relief, injunctive relief, and declaratory relief.

**COUNT VIII:**
**Violation of the Racketeering Influenced Corrupt Organizations**
**("RICO") Act, 18 U.S.C. § 1962(c), on behalf of Plaintiffs and RICO Plaintiffs**
**(40 West Defendants in their Individual Capacity)**

279.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

280.    The DPSCS Enterprise is an enterprise engaged in and whose activities affect interstate commerce.

281.    The 40 West Defendants are employed by and/or associated with the DPSCS Enterprise.

282.    The MCTC Enterprise is an enterprise engaged in and whose activities affect interstate commerce.

283.    The 40 West Defendants are employed by and/or associated with the MCTC Enterprise.

284.    The 40 West Defendants agreed to and did conduct and participate in the conduct of the DPSCS and MCTC Enterprises' affairs through a pattern of racketeering activity and for the unlawful purpose of smuggling and/or selling contraband in MCTC, retaliating against Plaintiffs and RICO Plaintiffs for their participation in a protected activity, and intentionally defrauding Plaintiffs and RICO Plaintiffs, including, *inter alia*: (1) fraudulently denying overtime opportunities; (2) perpetuating, maintaining, allowing, and failing to stop, correct, prevent and/or eliminate a systemic pattern or practice of retaliation against Plaintiffs and RICO Plaintiffs for engaging in official proceedings and/or protected activities; (3) smuggling contraband, including tobacco, into MCTC and/or selling contraband, including tobacco, in MCTC; and (4) other racketeering acts and practices which may reasonably be determined to have occurred through investigation during the discovery period of this matter.

285.     All of the 40 West Defendants operate and/or manage the DPSCS and MCTC

Enterprises' affairs by operating the MCTC compound for the direct benefit of DPSCS including,

but not limited to:

   a.  Enforcing rules of conduct and regulations inside the MCTC compound;
   b.  Maintaining security and safety by preventing disturbances, assaults, and escapes;
   c.  Supervising the daily activities of incarcerated individuals, ensuring all rules and procedures are followed;
   d.  Ensuring whereabouts of incarcerated individuals at all times;
   e.  Searching incarcerated individuals for contraband, such as weapons or drugs;
   f.  Subduing and restraining incarcerated individuals during fights, riots, and escape attempts;
   g.  Inspecting the MCTC compound to ensure standards are met;
   h.  Reporting on incarcerated individuals' conduct;
   i.  Restraining incarcerated individuals in handcuffs when necessary;
   j.  Aiding in the rehabilitation and counseling of incarcerated individuals;
   k.  Inspecting mail and visitors for prohibited items;
   l.  Writing incident reports and filling out daily activity logs;
   m.  Inspecting cells for unsanitary conditions, contraband, and any signs of security breaches; and
   n.  Operating manual and electronic cell locking systems.

287.     Further and specifically, the 40 West Defendants conducted and participated in the

operation and management of the DPSCS and MCTC Enterprises' affairs by organizing the

overtime shift schedule for the COs in the MCTC compound.

288.     Further and specifically, the 40 West Defendants conducted and participated in the

operation and management of the DPSCS and MCTC Enterprises' affairs by disciplining and/or

counseling Plaintiffs and RICO Plaintiffs.

289.     Pursuant to and in furtherance of their fraudulent and retaliatory scheme, the 40

West Defendants committed multiple related acts of fraud and retaliation over the course of several

years and which continues to the present through the aforementioned operation and management

of the DPSCS and MCTC Enterprises' affairs.

290.     The acts set forth above in ¶¶ 130(a) – (i) constitute a related and ongoing pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

291.     As Plaintiffs and the RICO Class claim numerous and repeated acts of fraud as predicate acts and as fraud must be plead with particularity, the fraudulent scheme as currently known to Plaintiffs is detailed herein:

a.   When an individual CO is unavailable for their shift or additional support is needed for a particular shift, the "Duty COL" will begin calling individuals pursuant to a "seniority list", which details when a CO began working at MCTC, beginning with the most senior and working down the list to the least senior. The "Duty COL" will call those COs currently on shift first, in order of seniority, and then calling all those off shift in order of seniority. The COs at MCTC, including Plaintiffs and the RICO Class, relied upon the use of the "seniority list" for equitable distribution of overtime shifts. A "Duty COL" is a COL which is assigned to an administrative position for that particular shift and the COL in that position will change from shift to shift and day to day. The 40 West Defendants exercise control over the "Duty COL" for every shift either because the "Duty COL" for that shift is a member or supports the activities of the 40 West Defendants. As such, the 40 West Defendants routinely exercised this control by ignoring the "seniority list" and calling or instructing "Duty COLs" to call members of "40 West" or those supportive of "40 West". This practice destroyed the equitable distribution of overtime compensation and these phone calls to COs who would otherwise have been ineligible for the overtime shift were fraudulent as they falsely stated that these COs were allowed to work the overtime shift. Further, Plaintiffs called the "Duty COLs" on numerous occasions over the years when they noticed they were not receiving equitable overtime shifts per the "seniority list". When pressed, the "Duty COLs" would falsely tell the Plaintiffs that it was not their turn for an overtime shift or that there was no overtime shifts available. Upon information and belief, this occurred to other similarly situated individuals when they called the "Duty COLs". Further adding to the gross inequity of this fraudulent scheme there is a cap on the number of overtime shifts which can be worked in each pay period. The 40 West Defendants exercise their control over the "Duty COLs" and are permitted to work overtime shifts over and above the cap. When called by Plaintiffs, "Duty COLs" have used the overtime shift cap as an excuse from allowing Plaintiffs to work an overtime shift. Plaintiffs and the RICO Class detrimentally relied on the "seniority list", the communications from the "Duty COL" of each shift, and the cap for overtime shifts. The "Duty COLs" and 40 West Defendants, who are one and the same in some respects, knew that they defrauded the Plaintiffs and RICO Class by not following the "seniority list" and forwarding false statements about eligibility for overtime shifts through wires. Additionally, the "Duty COLs" knew and fraudulently

concealed that each time the "seniority list" was published it would not be adhered to. The "Duty COLs" and 40 West Defendants defrauded the Plaintiffs and the RICO Class because they desired the overtime premium compensation which accompanied the overtime shifts. As the "Duty COLs" cycled through the position, all members of "40 West" and those supporting individuals would receive fraudulent overtime shifts. Plaintiffs have observed that they would receive significantly less overtime shifts in the first three to four months of the year because the members of "40 West" wanted additional shifts to pay for and/or make up for paying for vacations in that part of the year. The "Duty COLs" and 40 West Defendants intended for Plaintiffs and the RICO Class to rely on their fraudulent statements so that they could acquire the overtime compensation that they would have received had the "seniority list" been followed.

292.   The 40 West Defendants have directly and/or indirectly conducted and participated in the conduct of the MCTC and DPSCS Enterprises' affairs through the pattern of racketeering activity describe above in ¶¶ 128(a) – (i) in violation of 18 U.S.C. § 1962(c).

293.   The acts and omissions of the 40 West Defendants violated clearly established statutory and constitutional rights of which any reasonable person would have known existed at the time the acts and omissions were committed.

294.   As a direct and proximate result of the 40 West Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs and RICO Plaintiffs have been injured in their business and property, including, *inter alia*: (1) loss of overtime wages from fraudulently denied overtime opportunities; (2) loss of pay from retaliatory suspensions and/or bans from overtime shifts; and (3) other injuries which may reasonably be determined to have occurred through investigation during the discovery period of this matter.

WHEREFORE, Plaintiffs Alpheaus Bangura, Akinlolu Britto, Colenzo Grant, Maranda Guy, and Macardy Lovelace as well as the RICO Class demand judgment, jointly and severally, against the 40 West Defendants in an amount in excess of $75,000.00, for damages incurred as a result of the claims maintained herein, notably, lost wages, impaired earnings capacity, costs, pre-

and post-judgment interest, if applicable, attorneys' fees and the costs of pursuing this action, equitable relief, injunctive relief, and declaratory relief.

## COUNT IX:
### Violation of the Racketeering Influenced Corrupt Organizations ("RICO") Act, 18 U.S.C. 1962(d), on behalf of Plaintiffs and RICO Plaintiffs
### (40 West Defendants in their Individual Capacity)

295.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

296.   Alternatively, should some of the 40 West Defendants be determined to not be engaged in the operation and management of the MCTC and DPSCS Enterprises, the remaining 40 West Defendants are liable for conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

297.   As set forth above in Count VII, the 40 West Defendants agreed and conspired to violate and/or facilitate the violation of 18 U.S.C. § 1962(c), specifically, *inter alia*: (1) conspiring to improperly and/or fraudulently deny overtime opportunities; (2) conspiring to perpetuate, maintain, allow, and fail to stop, correct, prevent and/or eliminate a systemic pattern or practice of retaliation against Plaintiffs and RICO Plaintiffs for engaging in official proceedings and/or protected activities; and (3) conspiring to commit other racketeering acts and practices which may reasonably be determined to have occurred and/or were planned to have occurred through investigation during the discovery period of this matter.

298.   The 40 West Defendants intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the DSPCS and MCTC Enterprises through a pattern of racketeering activity.

299.     The 40 West Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described herein.

300.     The aforementioned conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

301.     As a direct and proximate result of the 40 West Defendants conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs and RICO Plaintiffs have been injured in their business and property, including, *inter alia*: (1) loss of overtime wages from fraudulently denied overtime opportunities; and (2) other injuries which may reasonably be determined to have occurred through investigation during the discovery period of this matter.

WHEREFORE, Plaintiffs Alpheaus Bangura, Akinlolu Britto, Colenzo Grant, Maranda Guy, and Macardy Lovelace as well as the RICO Class demand judgment, jointly and severally, against the 40 West Defendants in an amount in excess of $75,000.00, for damages incurred as a result of the claims maintained herein, notably, lost wages, impaired earnings capacity, costs, pre- and post-judgment interest, if applicable, attorneys' fees and the costs of pursuing this action, equitable relief, injunctive relief, and declaratory relief.

**[SIGNATURE BLOCK ON FOLLOWING PAGE]**

Respectfully submitted,

Edith K. Thomas, Esq. (CPF# 0412150354)
Thomas J. Eiler, Esq. (CPF# 2012170183)
Zipin, Amster & Greenberg, LLC
8757 Georgia Ave., Suite 400
Silver Spring, MD 20910
(301) 587-9373 (ph)
ethomas@zagfirm.com
teiler@zagfirm.com
*Counsel for Plaintiffs and
Putative Class Members*

**IN THE CIRCUIT COURT OF BALTIMORE CITY, MARYLAND**

| | | |
|---|---|---|
| **ALPHEAUS BANGURA, ET AL.** | * | |
| | * | |
| **ON BEHALF OF THEMSELVES** | * | |
| **AND ALL OTHERS SIMILARLY SITUATED** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **Case No.:** |
| | * | |
| **MARYLAND DEPARTMENT OF** | * | |
| **PUBLIC SAFETY AND CORRECTIONAL** | * | |
| **SERVICES, ET AL.** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

*******************************************************************************

## LINE REQUESTING ISSUANCE OF INITIAL SUMMONSES

Plaintiffs request the Clerk of this Honorable Court issue the Initial Summonses for the

Maryland Department of Public Safety and Correctional Services, Warden William Bohrer, Security

Chief Joseph Lohman, Gary Durboraw, Joseph Garlitz, and John Does 1-25 to be served via private

process.

Respectfully submitted,

Edith Thomas, Esq.  (Bar ID:30295)
Zipin, Amster & Greenberg, LLC
8757 Georgia Avenue, Suite 400
Silver Spring, Maryland 20910
Phone: 301-587-9373
Fax: 240-839-9142
ethomas@zagfirm.com
Attorney for Plaintiff